[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1221 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1222 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1223 
OPINION
E.S. appeals from the judgment of the juvenile court sustaining a petition alleging that he comes within the provisions of section 602 of the Welfare and Institutions Code. His court-appointed counsel initially filed a brief raising no legal issues and asking this court to conduct an independent *Page 1224 
investigation of the record pursuant to People v. Wende (1979)25 Cal.3d 436 [158 Cal.Rptr. 839, 600 P.2d 1071]. After conducting that review, we issued an order requesting supplemental briefing on the issue whether the Humboldt County Superior Court erred in denying appellant's motion for a new jurisdictional hearing.
Concluding it was error to deny the motion for a new jurisdictional hearing, we shall reverse and remand for such a hearing.
 FACTS AND PROCEEDINGS BELOW
On October 4, 2006, the District Attorney of Mendocino County filed a three-count petition pursuant to Welfare and Institutions Code section602 alleging that two days earlier appellant attempted to commit a lewd and lascivious act with a child under the age of 14 (Pen. Code, §§ 664, 288, subd. (a)), and on the same day annoyed or molested and made a criminal threat against the same child (Pen. Code, §§ 647.6, subd. (a), 422). Eight days later, the district attorney amended the petition to additionally charge a second attempt to commit a lewd or lascivious act with the same underage child.
Appellant, who was 17 years of age at the time the petition was filed, is a Native American eligible for enrollment in the Yurok Tribe. He had been previously declared a ward of the court in 2004 as a result of his commission of misdemeanor vandalism and, thereafter, battery on school property and theft, both also misdemeanors. The two latter offenses violated terms of the probation appellant was placed on for the vandalism. Appellant was again placed on probation and ordered to participate in the New Horizons program. It was difficult to find a residential placement for appellant because he had been abandoned by his mother in 2002, and his father was confined in the Humboldt County Correctional Facility on charges of vehicle theft and evading the police. Child Protective Services (CPS) was unwilling to place appellant with his grandmother, because her adult son Randall and his four children lived with her, and CPS believed appellant's claim that he had been physically abused by Randall, who had a criminal record. In 2004, appellant was permitted to live with his aunt Sherry S. in Mendocino County. In June 2005, he absconded from that placement and was subsequently apprehended and detained in the Mendocino County Juvenile Hall on February 8, 2006. With court approval, appellant was released from the New Horizons program on August 18, 2006, in order to facilitate another trial relative foster placement with Sherry S. It was shortly after this second placement with Sherry S. that the district attorney filed the petition before us.
On October 25, 2006, the day before the jurisdictional hearing was scheduled to begin, appellant moved for a one-week continuance. In support *Page 1225 
of the motion, Deputy Public Defender Shane Hauschild filed a declaration stating that he had been informed by a relative of appellant that the alleged victim and her mother "may have made similar accusations of molestation in the past" and that this information may lead to "exculpatory" evidence. Defense counsel also filed a petition pursuant to Welfare and Institutions Code section 827 seeking permission to inspect juvenile court records maintained by CPS apparently relating to the minor victim and/or her mother. The court granted a one-week continuance, resetting the jurisdictional hearing for November 3, 2006.
On October 31 the court conducted a hearing regarding appellant's motion to inspect juvenile records held by CPS. A representative of the Mendocino County Department of Social Services (Department of Social Services) testified that she had reviewed the CPS records "but I d[on't] find anything that really addressed the [minor victim's] honesty, truthfulness, veracity, or credibility." Defense counsel then pressed the court to allow inspection of reports of suspected child abuse or allegations by others that the minor had been untruthful; that is, anything "that's clearly relevant to her credibility whether it has to do with child abuse [or] not." The juvenile court agreed to inspect in camera the juvenile records produced by the Department of Social Services.
The court conducted a hearing the next day at which it stated that the records produced by Department of Social Services in response to appellant's motion to inspect revealed nothing warranting disclosure. According to the court, the records contain "some matters" regarding the victim but "nothing about any claims or allegations by the victim that she was molested which were either substantiated or not substantiated." The court ordered a copy of the records produced to "be put in a file and sealed, not to be opened [by county counsel] until further order of the Court so that they're part of the record in this case."[1]
The Jurisdictional Hearing
The contested jurisdictional hearing held in the Mendocino County Superior Court on November 3, 2006, was exceedingly brief. Four witnesses *Page 1226 
testified: the victim, T.S., who had just turned 10 years of age; her mother, Sherry S.; Mike Dygert, a detective with the Mendocino County Sheriffs Department; and appellant.
T.S. testified that on the evening in question she was alone in her house with appellant, who was her nephew, and her two brothers, I.S. and S.S., all of whom lived in the house together with her mother, who was at the time at her boyfriend's house. According to T.S., appellant came into her mother's room, where T.S. was then sleeping, awoke her by pulling down her sweatpants and, when they were down, asked her to suck his penis. After she began yelling for her mom and said she would tell what appellant had done, appellant assertedly told her "You better not tell anybody" or "else I'll hurt you." Appellant then stopped what he was doing and left. T.S. stated that appellant never took his clothes off and she never saw his "private parts," though he had put his hand under his belt. T.S. said she telephoned her mother, who returned home shortly and later called the police.
Sherry testified that appellant was related to her deceased husband and the nephew of her children, and she had known him since he was two years of age. She was aware he was on probation at the time she left him alone with her children, but knew him to be "[v]ery kind and gentle towards my kids" who "seemed to like his company" and she "had never seen him exhibit any behavior that would give [her] cause for concern." After she returned home and heard from T.S. what had happened, Sherry called Jason S., "an uncle — or brother of [T.S.], an older brother, and . . . an uncle of [appellant]," because she was worried and scared. Jason wasn't home but Sherry spoke with his wife, Arla S., "another sister of [T.S.]'s and an aunt to [appellant]." Arla said they would call back when Jason returned. A few minutes later, Arla called back and said "they were unwilling to get involved." Sherry then called the police. Sherry also testified that later, after the police left with appellant, she found a "bulky" black leather belt with a silver buckle in her bedroom. The belt belonged to her but appellant had borrowed it, because "he had some pants that were too big." Sherry said she had seen appellant in the house earlier that day with the belt.
On cross-examination Sherry said she did not call the police immediately after arriving home and hearing from her daughter what appellant had done because appellant was doing well in school and sports, and thereby turning his life around, and reporting him to the police might set him back. She was also "worried about the repercussions from the relatives because I didn't want to overreact." However, because child molestation was prevalent in her family, Sherry believed her daughter's accusation was truthful and called the police. Sherry testified that molestations had happened "not necessarily to me but to all my cousins, all my siblings, everybody I know. And I'm the only *Page 1227 
one of two people in my extended family of about three generations that I know wasn't molested as a child." When Sherry made this statement, defense counsel said "Okay. I don't have any more questions."
Officer Dygert testified simply that appellant had been asleep when he and another officer arrived at the residence in response to the call from Sherry. After talking to the victim and Sherry, he woke appellant up and arrested him. Because he was "groggy" Dygert did not interview appellant at the scene but took him to the police station. He did not recall whether appellant was wearing a belt at the time he was arrested or later at the police station. Although the officer's conduct was "accusatory," appellant was at no time belligerent or uncooperative. Officer Dygert was never asked and did not say what statements, if any, were made to him by appellant.
Appellant testified that at the time of the alleged offenses he had been living at Sherry's house for about six weeks. He was placed there by county officials after being found guilty of "fighting in school and getting caught at school with drugs," and was still on probation for those offenses, which occurred almost a year earlier. Appellant had good relations with all Sherry's children. He played football with her sons, and helped them with their homework and chores. Appellant stated that Sherry often left him alone with one of her sons, I.S., but except on one occasion she always took the other two children with her. On one occasion, however, Sherry asked him to watch all three children while she was away. Appellant told her he would only watch I.S. "[b]ecause [S.S.] was too young and him and his brother fight a lot," and he wouldn't watch the daughter "because I didn't feel, like, right around her." Appellant said that although he was sometimes "uncomfortable" around T.S., he "did not have any problems with her" on the day in question, during which she played happily with her brothers. Appellant attributed his feeling about T.S. to the fact that Sherry had told him that T.S. had been raped by one of his uncles. He stated that he was "disgusted" by this information and that "I just don't want to be one of those people because, you know, if I go to prison some day and this comes up, and I just hear a lot about them and stuff, you know."
When reminded of Sherry's testimony that at the time of the alleged offense he had been trying to "turn [his] life around" and asked why he was doing so, appellant replied: "I was tired of being locked up, and I just wanted to really change my life because I couldn't — I was just tired of being around walls. I felt like I was taking my father's footsteps. But after I completed my program, I was, like, really wanting to turn my life around. It was going [in] that direction. But then this crime came up." Appellant insisted that the charged molestation and threat never occurred. He testified that he went to bed about three minutes after Sherry left the house at 10:00 p.m., fell asleep *Page 1228 
almost immediately, and stayed asleep until he was "woken up by the cops." Appellant was sure he went to bed about 10:03 p.m. because when Sherry got off the phone with her boyfriend and went to her room and left, he saw on his computer that it was 10:00 o'clock "[a]nd then three minutes later I just jumped off and went to bed." When asked whether, as T.S. testified, he had a belt on at the time he molested her, appellant stated that he did not have a belt on at any time during the night in question or during that day. He was at all times wearing the blue pants in which he was sleeping when awoken by Officer Dygert. Appellant's testimony on direct examination ended with the following short colloquy:
"Q. Did you ever at anytime that night go into Sherry's bedroom [in which the victim claimed she was sleeping when the molestation occurred]?
"A. No, I did not. [¶]. . . [¶]
"Q. Did you ever talk to [the victim] that night?
"A. No, I did not.
"Q. And you never woke up that entire night?
"A. Never. The only time I woke up is for the cops."
On redirect, appellant stated that he had a girlfriend his own age (17) with whom he was still "involved," and had dated other girls in the past, the youngest of whom was 16.
At the close of the jurisdictional hearing the court found appellant guilty beyond a reasonable doubt on one of the two alleged attempts to commit a lewd or lascivious act with a child under the age of 14 (Pen. Code, §§ 664, 288, subd. (a)) and on the charge that he annoyed or molested a minor (Pen. Code, § 647.6, subd. (a)). The prosecution thereupon dismissed the allegation of criminal threat. No finding was made with respect to the second alleged attempt to commit a lewd or lascivious act with the same victim.
The juvenile court's finding rested on the testimony of the victim. As the court stated: "I think fundamentally what it comes down to is whether the child is credible or not. And I've had the opportunity to observe her. I didn't see any signs that she was using language that was the obvious result of coaching. She's amazingly smart and was a little nervous, but did pretty good in coping with the whole situation. . . . I didn't see any signs that she wasn't truthful. And I think that I'm satisfied beyond a reasonable doubt that she did tell me truth and her testimony . . . clearly establishes that the elements are *Page 1229 
met. [¶] She was under 14, and she was touched . . . and it was with the intent to gratify the minor's sexual desires."
At the close of the jurisdictional hearing, the district attorney indicated there was reason to believe appellant was not then residing in Mendocino County but with his father in Humboldt County, and the court should therefore consider transferring the case to that county. (Welf. Inst. Code, § 263.) On November 14, 2006, after the probation department had also recommended that the case be transferred, the court ordered appellant's case transferred to Mendocino County.
The Motion for a New Jurisdictional Hearing
On February 16, 2007, appellant's newly appointed counsel, Humboldt County Deputy Public Defender Joanne Carter, moved for a new jurisdictional hearing on the ground that appellant had been denied the effective assistance of counsel during the jurisdictional proceedings in Mendocino County. In support of the motion, she argued that his former attorney, Shane Hauschild, "knew that the case needed investigation for a proper defense but chose not to request that assistance due to the mistaken belief that he was not entitled to confidential court experts," such as "exparte funding for an investigator, psychological evaluation and polygraph examination." Appellant contended that his former counsel failed to request a psychological evaluation and other "ancillary defense services" he knew to be necessary, and that the failure to request such assistance was "[f]or his own personal reasons (fear of being fired) not for tactical reasons."
In her brief in support of her motion for a new jurisdictional hearing, [2] Carter stated that prior counsel was ineffective also because he failed to voir dire T.S. to determine whether she was incapable of understanding the duty to testify truthfully, he failed to adequately inquire of T.S. during his nine-minute cross-examination whether she understood the difference between the *Page 1230 
truth and a falsehood, and whether she had discussed her testimony with others and if so what was said during those discussions. He was ineffective also, Carter argued, in failing to require that T.S., on the record, take the oath required by Evidence Code section 710.[3]
The motion further alleged that Hauschild was ineffective because there was at the outset a need and good cause for a continuance of more than one week, and his failure to seek an adequate continuance was tactically and otherwise unjustified and based upon an erroneous understanding of the law. Carter urged it was also ineffective and unprofessional for prior counsel to fail to request a continuance after Sherry testified she was "only one of two people in my extended family of about three generations that I know that wasn't molested as a child." "Unbelievably," appellant's new counsel argued, "after this bombshell of a disclosure, the defense attorney's response was `Okay. I don't have any more questions.' How can this be? The witness in this case, a 10 year old girl, apparently grew up in and around a family of three generations experiencing molest. Does this not warrant at least some further examination on the stand, at a minimum, and then possibly a further continuance for further investigation." Carter complained as well that former counsel failed to impeach T.S. with discrepancies between the description of appellant's conduct she gave at the jurisdictional hearing and that she gave Officer Dygert when he interviewed her on tape on the night in question. The audiotape of Officer Dygert's interview, attached to the motion papers, assertedly showed that Officer Dygert's questions of T.S. were leading, and that her answers were coached by her mother. Hauschild never offered the audiotape of this interview, or the transcript thereof, as evidence. He also failed to offer in evidence the tape of Officer Dygert's interview with appellant. This tape is assertedly significant not only because appellant vigorously denied T.S.'s accusation, as he has consistently done, but also because it shows the difficulty Officer Dygert had in waking him up and the depth of his sleep, which is arguably inconsistent with his participation in a molestation claimed to have just occurred. Finally, Carter argued that prior counsel inexcusably failed to interview Jason and Arla S., appellant's uncle and aunt, with whom Sherry testified she spoke by phone shortly before she called the police. Carter argued the foregoing failures of counsel were highly prejudicial.
The motion for a new jurisdictional hearing also pointed out that the jurisdictional hearing "began at 10:10 a.m. and a recess was taken from 10:39 a.m. to 11:16 a.m. The matter was recalled and a recess was taken again from *Page 1231 
11:54 a.m. to 1:32 p.m. The hearing resumed and was concluded at approximately 2:15 p.m." Thus, appellant emphasizes, "[t]he entire contested hearing took less than two hours upon the conclusion of which, the court found the allegations . . . to be true."
Hauschild, appellant's former attorney, filed a lengthy declaration in support of the motion for a new jurisdictional hearing. He states that (1) he needed more than a week to investigate information he received from appellant's relatives that might lead to exculpatory evidence, but erroneously believed he was only entitled to a seven-day continuance; (2) his "excessive caseload" made it impossible to "thoroughly review and litigate each and every case" he was then litigating, including appellant's case;[4] (3) the Mendocino County Public Defender's Office lacked an investigator and he was expected to conduct his own investigations, which was "all but impossible" in light of his heavy caseload; (4) he considered requesting an evaluation of appellant's mental condition similar to that authorized by Penal Code section 288.1
but was told by the public defender that his office would not pay for one; (5) he did not ask the court to order and pay for such an evaluation because the court had told him a court-ordered evaluation would not be confidential; (6) he did not request a polygraph of appellant "because I know that the Courts will not pay for one and I knew from my conversations with the Public Defender that my Office would not pay for a polygraph"; and (7) he feared that "if I requested or attempted to demand funding for a polygraph for my client, my job would be jeopardized." (Appellant's new attorney obtained a polygraph test and submitted the results, which showed appellant's denial of the charged offenses was truthful, to the court in support of the motion for a new jurisdictional hearing. As later explained, the result of the polygraph test was also discussed in a psychological evaluation considered by the court at the dispositional phase of the proceedings.) Hauschild asserts that his "numerous attempts to discuss my cases and caseload with the Public Defender were unsuccessful." For example, when he told him his unmanageable caseload interfered with his ability to represent appellant and his other clients the public defender responded: "I'm doing a murder case, do you want to trade?"
Hauschild's declaration ends with the statement of his belief "that much more should have been done in defending [appellant's] case. Specifically, this case required more resources, support from more experienced attorneys, proper investigation, sufficient investigative services, and assistance with an *Page 1232 
extremely serious W I 602 petitions [sic] in addition to numerous contested LPS Conservatorship cases. None of these things were possible in light of my fear that I would lose my job if I pushed these issues with the [Mendocino County] Public Defender." Hauschild stated his investigation of the case consisted only of his conversations with appellant and request that the court inspect T.S.'s confidential juvenile court file, which he was not allowed to personally review. (See Welf. 
Inst. Code, § 827.)[5]
Humboldt County Superior Court Judge Christopher G. Wilson conducted three hearings on the motion for a new jurisdictional hearing. Jason S., appellant's uncle and Sherry's cousin, testified that he attempted on several occasions to speak with Attorney Hauschild before and during appellant's jurisdictional hearing to provide information he thought Hauschild would find useful to appellant's defense. Among other things, he thought Hauschild should talk to his wife about her phone conversations with Sherry before the latter called the police. Jason's father, who was no longer alive, had had an affair with Sherry, who was his niece, and fathered two of her children, who were therefore Jason's stepsiblings. This incestuous relationship was controversial within the family's tribe and created tension between Sherry and others in the family. Appellant often visited Jason, and sometimes brought Sherry's two sons with him. Sherry felt Jason was competing with her for her sons' attention and thought appellant assisted him in this, and she took out her anger by constantly threatening appellant. Jason thought it relevant to appellant's defense that T.S. had been molested by one of Sherry's uncles, who also tried to molest one of T.S.'s brothers. Sherry told Jason her ex-husband had also tried to molest her son I.S., and had broken the boy's arm in the process, and then moved on to molest or try to molest T.S. Jason stated that Sherry told him she had "reported" the molestation or attempted molestation of T.S. Jason felt the molestations or attempted molestations of Sherry's children by her uncle and her ex-husband, and her concerns about those molestations and others within the family, were the reasons she threatened appellant "in front of me and my wife and kids, [and] whoever else was around," such as by telling him "`I'll send you back to Juvenile Hall.'"
Jason also thought it relevant that Sherry's youngest son, S.S. was found at a daycare center "kissing on another boy, sucking on the boy's penis" and T.S. attended the same daycare facility. Jason also wanted Hauschild to know that, though he loved T.S., who he referred to as his sister, she often lied. Recently, for example, one of Jason's daughters was upstairs in his *Page 1233 
house on her birthday, and Jason instructed a nephew named David not to allow other children arriving for the party to go upstairs because they would tell her of the presents downstairs and spoil the surprise. When T.S. began walking upstairs, David tried to stop her and Jason heard T.S. respond that if he didn't let her pass she would tell others "`that you pushed me down the stairs and you hit me.'"
Finally, Jason thought Hauschild should know that Sherry told him she had initiated sexual intercourse with Jason's nephew, Josh, who was under 18, and Josh confirmed this. Sherry told Jason that Josh "`wants an older woman' and stuff." She also told him that she had sex with many other boys.
Because he thought the foregoing information would help Hauschild defend appellant, Jason repeatedly attempted to discuss it with Hauschild, but he "didn't want to talk to me really." Jason gave Hauschild his phone number and those of his wife and sister, but none of them were ever called. However, Jason also said that he was able to pass on to Hauschild the basic information that Sherry told him her ex-husband attempted to molest her son I.S. and broke his arm; she had an incestuous relationship with an uncle and two of her children were his; she seduced a young underage relative (Josh); S.S. molested a child at daycare by sucking his penis; and T.S. threatened to lie in order to get her way at the birthday party. Jason also gave Hauschild "contact information" for others who could corroborate the information he provided.
On cross-examination, Jason testified that he spoke briefly with Hauschild three times on the phone prior to the jurisdictional hearing and twice in the courthouse on the day it took place. During one of his phone conversations Jason asked Hauschild "what his background was, what kind of a lawyer he was, like, as far as what kind of cases he usually takes" and because "he didn't like some of the questions I was asking him, . . . he hung up." "[W]hat happened was he started to get, you know, like with an attitude towards me for asking him how long he's been a lawyer or how long has he been practicing. And he — he hung up on me."
Later, when Hauschild returned a call from appellant's grandmother, she asked him to speak with Jason, he agreed, and she put Jason on the phone. It was during that call — which lasted 15 or 20 minutes, and took place a week after appellant was arrested — that Jason provided some of the information earlier described. Hauschild said he was unable to speak longer with Jason because he was so busy with his other cases. Jason later provided Hauschild additional information during two short phone conversations. According to Jason, Hauschild did not follow up on the contacts he had given him, which was apparently the reason Jason tried to talk to Hauschild in the courthouse on the day of the hearing. Jason asked Hauschild "`How come there's no *Page 1234 
witnesses here?' `How come you didn't contact nobody?'" Hauschild said "`You questioning me?' And just got irate in front of everybody."
At the end of cross-examination Jason acknowledged he had known appellant all of his life and also that he had spent time in prison for assault with a deadly weapon and kidnapping, and the victims of both were other Native Americans but not members of his family. Jason, who worked as a crane operator, had been out of prison for six years.
The arguments of counsel on the motion for a new jurisdictional hearing were separately heard by Judge Wilson on May 10, 2007. Carter argued that Hauschild's declaration and Jason's testimony indicated that, despite the information and contacts he was provided by Jason, which he did not follow up, Hauschild's defense of appellant consisted of little more than his conversations with appellant and the filing of the petitions asking the court to inspect juvenile court records pursuant to Welfare and Institutions Code section 827. Carter also emphasized Hauschild's complete failure to respond appropriately to Sherry's emotional testimony that she was one of only two people in her extended family of about three generations "that I know that wasn't molested as a child," presumably because this provided an opportunity for Hauschild to explore the level of child molestation within the family and the victim's familiarity with forms of child molestation. Carter also called attention to Hauschild's failure to voir dire T.S. with respect to competency, at which time he could have asked whether she ever lied or threatened to lie in order to get her way, and to subject her to meaningful cross-examination regarding, for example, asserted discrepancies between her direct testimony and her statements to the arresting officer. Citing In reMarquez (1992) 1 Cal.4th 584, 608-609 [3 Cal.Rptr.2d 727, 822 P.2d 435], Carter claimed Hauschild's ineffectiveness was also shown by his failure to put before the court many positive aspects of appellant's life, and the support of him by other members of his family, such as Jason, and the fact that he had never before been charged with any sexual impropriety.
Finally, Carter called attention to the statement in Hauschild's declaration that, despite the fact that "I clearly required more time than a seven day continuance to fully investigate and competently defend the case," he sought a continuance for only seven days because he understood that under Welfare and Institutions Code section 682 "I was only entitled to a seven day continuance for a juvenile delinquency case." Carter suggested that Hauschild's understanding of the law was erroneous.
The district attorney maintained that appellant had not shown Hauschild's conduct fell below an objective standard of reasonableness. Conceding that there were things Hauschild could have done differently, the prosecutor *Page 1235 
pointed out that Hauschild met with and spoke with family members, including Jason, and "made the reasonable conclusion that the information was irrelevant, that it would not be fruitful in supplying him with a viable defense to the allegations." According to the prosecutor, "it was probably a strategical decision to not delve into the prior family history of molest. I think that's something that, arguably, could prejudice his client just as well as serve him in formation of a defense. I think it's reasonable that a trier of fact, perhaps not properly, may — but may, nonetheless, conclude that a young man who is in a family that has multiple incidences of molest may be more likely to himself have committed a molest. I think that was properly a door that, frankly, Mr. Hauschild properly chose not to open and at least not explore any further."
The district attorney felt it was reasonable for Hauschild to point out the language T.S. used was sophisticated for a child her age; to emphasize how deeply asleep appellant was when he was found by Officer Dygert shortly after the offense was alleged to have occurred, and to also underscore that though appellant had in the past run away from Sherry's house when he got in trouble, he remained there this time. According to the district attorney, Hauschild "fairly successfully portrayed [appellant] as a nice young man that was on the right path for once and doing fairly well and not someone that would have risked this over engaging in the sort of conduct that was alleged. [¶] He clearly had a well-planned and orchestrated defense, and he presented it clearly and concisely to the Court."
Finally, the prosecutor argued that even if Hauschild's conduct was not considered objectively reasonable, there would not have been a different outcome even if he had taken all of the courses of action outlined by his present counsel, because "[i]t seems clear from the trial judge's ruling . . . that he based his determination upon the believability of the nine-year-old victim. And I think . . . we would have seen the exact same outcome."
In rebuttal, Carter emphasized a criminal defense attorney's duty to investigate. "I think it's important that these leads be investigated. I don't think it was a wild goose chase. I really don't think it was a wild goose chase. But that isn't our decision to make. I think we have a duty to investigate and that is where Mr. Hauschild failed [a]nd that is what prejudiced [appellant] as he sits here today."
Judge Wilson took the motion for a new jurisdictional hearing under submission and at a hearing four days later issued his ruling denying the motion. Acknowledging that Hauschild made "errors" and that there were questions about the credibility of the complaining witness and her mother, Judge Wilson also noted that Jason, the sole witness at the hearing on the *Page 1236 
motion, was a convicted felon, and that much of his testimony was hearsay. Judge Wilson felt Judge LaCasse relied primarily on T.S.'s testimony and placed little weight on that of Sherry S. and Officer Dygert. In Judge Wilson's view, however, Sherry's testimony deserved some weight because Jason corroborated her testimony that she called other members of the family before she called the police. Finally, Judge Wilson stated his satisfaction that Judge LaCasse's jurisdictional determination was supported by sufficient evidence. Judge Wilson then set a date for a contested dispositional hearing.
The Dispositional Hearing
On April 25, 2007, a little more than two months after the motion for new jurisdictional hearing had been filed but before the hearing on that motion, appellant's new counsel filed an ex parte application for an order authorizing funding for expert services to assist her in connection with appellant's motion for a new jurisdictional hearing. The court granted the request, directing payment from the county general fund to pay Dr. Andrew Renouf $1,500 for his services. Dr. Renouf's report emphasizes that his assessment of appellant was complicated by "the undetermined validity of the charges" against appellant, and the fact that "in many ways [E.S.] does not fit the typical personality or historical profile for juvenile sex offenders." The report acknowledges that appellant "comes from an extremely dysfunctional family background and has likely gravitated towards gang involvement as a way for substituting for his missing family members and helping him survive on the streets," but at the same time he "was going to school, performing well academically, and participating in team sports. He reportedly was liked by his coach and high school principal, and is liked by Regional Facility staff. He was described as respectful of authority, a strong participator in treatment groups, and a positive peer leader. In addition, [appellant] passed a polygraph test denying he committed the index offense, reportedly engaged in age-appropriate sexual activity when he had the opportunity, has generally good impulse control, and no unusual sexual preoccupations revealed by psychological testing results or history." Dr. Renouf repeatedly points out that appellant "adamantly" and "consistently denied the allegations against him of molest" and notes "that the abilities to not confess when faced with a polygraph test and to maintain one's innocence over an extended period of time imply a level of psychological sophistication which test results suggest [appellant] does not possess."
Dr. Renouf concluded that, "[if] the allegations of sexual molest areunfounded, [E.S.] would not require sex-offending treatment." However, assuming, as did Judge LaCasse, that appellant committed the alleged molestation, Dr. Renouf felt compelled to recommend a treatment program designed to "break-down [E.S.'s] denial and have him assume responsibility *Page 1237 
for his behavior." Like the probation department, Dr. Renouf recommended placing appellant in a suitable residential treatment program. He felt medication was not required but that drug and alcohol treatment programs would be appropriate.
At the commencement of the disposition hearing conducted on June 8, 2007, Judge Wilson stated that he had read the original and supplemental disposition reports and, upon counsels' submission of the issue to the court, ordered residential treatment and counseling or sex offender treatment. Judge Wilson expressed concern that he did not have a Penal Code section 288.1 evaluation of appellant, but felt "Dr. Renouf's evaluation suffices in that respect." Presumably on the basis of that evaluation, Judge Wilson concluded that "I don't consider [appellant] to be necessarily a danger to the community by way of potential for sexual offense. But I do consider him to be a danger to the community by way of his lack of impulse control and substance abuse and also the unavailability of adequate familial support." (Judge Wilson noted that Dr. Renouf disagreed with his conclusion that appellant lacked impulse control.)
At that point in the dispositional proceedings, appellant's counsel sought leave to renew the motion for a new jurisdictional hearing, basing the request on several statements in Dr. Renouf's report, including the statements that appellant "does not fit the typical personality or historical profile for juvenile sex offenders" and lacked the "psychological sophistication" to maintain his innocence in the face of a polygraph test and then pass the test. The district attorney opposed the request to renew the motion for a new jurisdictional hearing, and the court denied it, stating that a different evaluator "might see [appellant] differently, I suppose." Judge Wilson noted that although "my experience with Dr. Renouf is that he's straightforward and objective [and] [t]here's no reason for me to doubt his evaluation in any respect. [¶] . . . I found the victim's testimony and recitation to be straightforward [and] I, frankly, agreed with the Judge who presided over the jurisdictional hearing." Agreeing that appellant's offense was not "an aggravated, sexual-type assault," but "an instance of poor impulse control and poor judgment," Judge Wilson denied the request to renew appellant's motion for a new jurisdictional hearing.
The court found: the maximum time of confinement was 7 years 3 months 19 days; appellant's continuance at the home would be contrary to his welfare; reasonable efforts had been made to prevent his removal from that home and enable his return thereto. Accordingly, the court ordered that appellant be retained as a ward of the court, committed to the care and custody of the probation officer, and that all previous probation orders remain in force. As noted, appellant was placed in a residential treatment facility to receive counseling or sex offender treatment. *Page 1238 
 DISCUSSION
The principles that guide our analysis were set forth by our Supreme Court more than 20 years ago in People v. Ledesma (1987) 43 Cal.3d 171 [233 Cal.Rptr. 404, 729 P.2d 839] (Ledesma), and are still applicable: "Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel. (E.g., Stricklandv. Washington (1984) 466 U.S. 668, 684-685 [80 L.Ed.2d 674, 104 S.Ct. 2052] [discussing federal constitutional rights]; People v. Pope [(1979)]23 Cal.3d 412, 422 [152 Cal.Rptr. 732, 590 P.2d 859] [discussing both state and federal constitutional rights].) The ultimate purpose of this right is to protect the defendant's fundamental right to a trial that is both fair in its conduct and reliable in its results. (See, e.g.,Strickland, supra, at pp. 684-687 . . .; Pope, supra,23 Cal.3d at pp. 423-425.) [¶] Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather toeffective assistance. (E.g., Strickland, supra, 466 U.S. at p. 686 . . .; Pope, supra, 23 Cal.3d at pp. 423-424.) Specifically, it entitles him to `the reasonably competent assistance of an attorney acting as his diligent conscientious advocate.' (United States v. De Coster (D.C. Cir. 1973) 487 F.2d 1197, 1202, italics deleted; accord, Pope, supra, at p. 423; see, e.g., Strickland, supra, at pp. 686-689. . . .) [¶] Under this right, the defendant can reasonably expect that in the course of representation his counsel will undertake only those actions that a reasonably competent attorney would undertake. But he can also reasonably expect that before counsel undertakes to act at all he will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation. (See, e.g., In re Hall (1981)30 Cal.3d 408, 426 [179 Cal.Rptr. 223, 637 P.2d 690]; People v.Frierson (1979) 25 Cal.3d 142, 166 [158 Cal.Rptr. 281, 599 P.2d 587]; see also Strickland, supra, 466 U.S. at pp. 690-691. . . .) If counsel fails to make such a decision, his action — no matter how unobjectionable in the abstract — is professionally deficient." (Ledesma, supra,43 Cal.3d at p. 215.)
The test to determine whether a criminal defendant's claim that counsel's assistance was so defective as to require reversal of a conviction consists of two prongs. First, the defendant must show that counsel's performance was deficient in that it "fell below an objective standard of reasonableness . . . [¶] . . . under prevailing professional norms." (Strickland v. Washington, supra, 466 U.S. at p. 688
(Strickland); accord, People v. Pope, supra, 23 Cal.3d at pp. 423-425
(Pope).) If counsel's performance has been shown to be deficient, the defendant is entitled to relief only if it can additionally be established that he or she was prejudiced by counsel's deficient performance. (Strickland, supra, at pp. 691-692; accord, Ledesma, supra,43 Cal.3d at p. 217.) As to these issues, the defendant bears the burden of proof. (Pope, supra, at p. 425.) *Page 1239 
We shall conclude that Hauschild's performance was deficient in that he (1) failed to investigate potentially exculpatory evidence, (2) sought an inadequate continuance based on a mistake of law, and (3) failed to move for a substitution of counsel knowing he was unable to devote the time and resources necessary to properly defend appellant. Further concluding that these deficiencies were prejudicial, we shall reverse the judgment.
 I.
Emphasizing the duty of defense counsel "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary" (Strickland, supra, 466 U.S. at p. 691), appellant correctly points out that a defense attorney who fails to investigate potentially exculpatory evidence, including evidence that might be used to impeach key prosecution witnesses, renders deficient representation. (See, e.g., In re Jones (1996) 13 Cal.4th 552, 564-565 [54 Cal.Rptr.2d 52, 917 P.2d 1175]; Reynoso v. Giurbino (9th Cir. 2006)462 F.3d 1099, 1112; Rios v. Rocha (9th Cir. 2002) 299 F.3d 796, 805;Hart v. Gomez (9th Cir. 1999) 174 F.3d 1067, 1070; Sanders v. Ratelle
(9th Cir. 1994) 21 F.3d 1446, 1456.) California case law makes clear that counsel has an obligation to investigate all possible defenses and should not select a defense strategy without first carrying out an adequate investigation. (In re Gay (1998) 19 Cal.4th 771, 790 [80 Cal.Rptr.2d 765,968 P.2d 476]; In re Visciotti (1996) 14 Cal.4th 325, 334 [58 Cal.Rptr.2d 801, 926 P.2d 987]; In re Vargas (2000)83 Cal.App.4th 1125, 1133 [100 Cal.Rptr.2d 265]; Rios v. Rocha,supra, 299 F.3d at pp. 805-806.)
It bears noting that appellant was charged with a violation of Penal Code section 288, subdivision (a), a serious and violent felony and a potential strike (Pen. Code, §§ 1192.7, subd. (c)(6), 667.5, subd. (c)(6), 1170.12, subd. (b)(1)), and an offense exposing him to sex offender registration requirements. (Pen. Code, § 290.008; In re G.C. (2007)157 Cal.App.4th 405 [68 Cal.Rptr.3d 523].) While we do not intend to imply that any criminal charge is insignificant, reasonable counsel certainly would have appreciated the need to devote adequate time and resources to appellant's defense.
From the police report and his discussions with appellant, Hauschild must have been aware at the outset that the prosecution's case rested almost entirely on the credibility of T.S., who had just turned 10, because she was the only witness to the alleged offense and there was no physical evidence corroborating her claim. The information Jason S. provided Hauschild less than a week after he was appointed to represent appellant included not only that T.S. had been molested by an uncle and perhaps also her father, and therefore had been exposed to more sexual conduct than most 10 year olds, but also that on a specific occasion she threatened to lie in order to work her *Page 1240 
will. Jason also provided the names of others who could corroborate this information, and told Hauschild how he could contact these individuals. Additionally, Jason informed Hauschild that Sherry was angry with appellant because of his relationship with Jason and for this reason, as well as her sensitivity about the molestation of her children by other relatives, had threatened appellant that she would "send him back to juvenile hall." Despite the potential use of this information to impeach T.S. and Sherry, Hauschild made no investigatory efforts.
The sexual experiences of not just T.S. but also her siblings could have been used by the defense to advantage if the information Jason provided had been investigated and verified, even in part. For example, T.S.'s prior molestation by an uncle, who allegedly also molested I.S., and evidence that S.S. had been found "sucking the penis" of another child, suggests T.S. may have been aware of this form of child molestation. Jason testified that he gave Hauschild the address of the daycare center at which S.S. was found sucking the penis of another child, and the name of the daycare employee to talk to, but Hauschild never contacted that person because, as he explained in his declaration, he had neither the time nor the investigatory resources.
In In re Vargas, supra, 83 Cal.App.4th 1125, in which the petitioner was charged with forcible lewd conduct upon a child, the expected defense was that the petitioner's daughter and ex-wife concocted the story of molestation out of revenge because he was leaving his ex-wife and his daughter did not want to move with him to another state. Although many family friends had apparently agreed to testify on the petitioner's behalf, his attorney called none of them as witnesses. The attorney claimed that neither the petitioner nor many members of his family with whom she spoke were able to identify such willing witnesses. This representation was contested and the court ordered an evidentiary hearing to ascertain whether an investigation was warranted, whether the attorney conducted an investigation, and whether any investigation was sufficient or perfunctory. (Id. at p. 1138.) The doubt presented in Vargas as to whether defense counsel conducted an adequate investigation does not exist in the present case, as Hauschild fully acknowledges he received information warranting an investigation he failed to conduct.
In Williams v. Washington (7th Cir. 1995) 59 F.3d 673, as here, the credibility of the complaining witness was the central issue. The petitioner, who had been convicted in state court of indecent liberties with her 13-year-old adopted daughter, asserted the denial of effective assistance of counsel at trial. The only persons who testified at the bench trial were the child, a police officer, the petitioner, and her husband. Aside from airing the petitioner's denials and those of her husband, defense counsel called no witnesses and produced no evidence in favor of the petitioner despite the existence of *Page 1241 
school files suggesting the child victim "`had a problem telling the truth.'" (Id. at pp. 675-676.) Though defense counsel admitted he conducted no investigation other than speaking with his clients, the state insisted this behavior was objectively reasonable "because this case was a `simple' credibility contest." (Id. at p. 681.) The court disagreed. Pointing out that the excluded witnesses would have bolstered the testimony of the petitioner and her husband and undercut that of the child, the court concluded that "[b]ecause investigation into this matter might have revealed evidence bearing upon credibility (which counsel believed was the sole issue in the case), the failure to investigate was not objectively reasonable." (Ibid., citing Chambers v. Armontrout (8th Cir. 1990) 907 F.2d 825, 830-831, cert. den. sub nom. Armontrout v.Chambers (1990) 498 U.S. 950 [112 L.Ed.2d 331, 111 S.Ct. 369].)
Here, the district attorney did not argue that Hauschild would have been unable to corroborate the information Jason wanted to provide him and use this evidence to impeach T.S.'s credibility. Her argument was that this would have been a risky strategy and Hauschild had a good tactical reason for not pursuing it. According to the district attorney, pursuing the incest and sexual acts of Sherry and the sexual experiences of her children would have been a strategic mistake, because "it's reasonable that a trier of fact, perhaps not properly, . . . may, nonetheless, conclude that a young man who is in a family that has multiple incidences of molest may be more likely to himself have committed a molest. I think that was probably a door that, frankly, Mr. Hauschild properly chose not to open. . . ." This argument is self-defeating, for it ignores Hauschild's duty to anticipate the very danger the district attorney described; namely, that, for the reasons given by the district attorney, the prosecution might introduce the regularity of sexual molestation within appellant's family — as indeed it did through Sherry's direct testimony that molestations were commonplace in her extended family, which included appellant.
Hauschild concedes in his declaration, and it seems to us clearly the case, that he had no tactical justification for his failure to investigate and "much more should have been done in defending this case." As we have seen, the reasons Hauschild offers for the deficiencies in his representation of appellant pertain solely to the magnitude of his caseload, which assertedly made "it impossible for me to thoroughly review and litigate each and every case, several of which were serious and violent felonies, including [appellant's] PC 288 strike case," as well as the inadequate investigative and other resources of the Mendocino County Public Defender's Office. Hauschild's attempt to obtain such resources and/or obtain relief from the competing demands of his many other cases were assertedly rebuffed by his supervisor, and Hauschild *Page 1242 
feared he "would lose my job" if he continued to push these requests, as would also happen "if I requested or attempted to demand funding for a polygraph for my client."
Acknowledging Hauschild made "errors," the court found the evidence he was ineffective inadequate because it consisted primarily of Jason S.'s testimony that he provided Hauschild information potentially useful to appellant's defense which Hauschild failed to pursue. The trial judge disregarded Jason's testimony because he believed it consisted of "multiple layers of hearsay" and was not credible due to the fact Jason is an ex-felon. Jason S.'s testimony cannot be so easily dismissed.
To begin with, Jason's credibility was not to be measured from the perspective of a trier of fact at a trial on the merits, as the court did, but from that of an attorney charged with the duty to defend a client against criminal charges. The question before the court was not whether Jason's claims were true, but whether Hauschild's failure to inquire into their truth was reasonable; that is, would a reasonable attorney in Hauschild's shoes have felt a professional duty to his client to verify those claims? Given Jason's long relationship with and knowledge of appellant, Sherry, and T.S. and her siblings, the specificity and facial significance of the information he provided, and his identification of others who would assertedly corroborate his claims and how such persons could be contacted, no reasonable defense attorney would have declined to investigate the information he provided simply because it contained hearsay and Jason was an ex-felon (especially one who had been released from custody six years earlier and was presently gainfully employed).
As our Supreme Court has observed, "`"strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."'" (In re Thomas (2006) 37 Cal.4th 1249, 1258 [39 Cal.Rptr.3d 845, 129 P.3d 49]; see also Pope, supra,23 Cal.3d at pp. 424-425.) As we have explained, the People offer no persuasive strategic reason for Hauschild's admitted failure to investigate.
The trial court's failure to assign any significance to, or even to mention, Hauschild's lengthy and detailed admission of his own deficiencies and explanation of the reasons he failed to provide appellant the diligent advocacy to which appellant is constitutionally entitled is inexplicable. *Page 1243 
 II.
Hauschild states in his declaration that he knew the seven-day continuance he sought and received was inadequate to permit him to fully investigate and competently defend appellant, but declined to seek a longer continuance because he believed Welfare and Institutions Code section 682 did not permit a continuance longer than seven days. One of the tests of whether counsel has provided effective representation is whether he or she "effectively suppl[ied] to a defendant those skills andlegal knowledge which we can reasonably expect from any member of the bar." (People v. Cook (1975) 13 Cal.3d 663, 672-673 [119 Cal.Rptr. 500,532 P.2d 148], italics added, cited with approval in People v. Pope,supra, 23 Cal.3d at p. 421.)[6] Hauschild's understanding of section 682 is incorrect. That statute provides that upon a showing of good cause a continuance may be granted "for that period of time shown to benecessary by the moving party at the hearing on the motion." (Welf. 
Inst. Code, § 682, subd. (b), italics added; see also Pen. Code, §987.05.) Subdivision (e) of section 682 — which provides that "the hearing shall commence on the date to which it was continued or withinseven days thereafter whenever the court is satisfied that good cause exists [for a further continuance] and the moving party will be prepared to proceed within that time" (italics added) — does not limit the period for which the initial continuance may be granted on a showing of good cause. So far as we can ascertain from the record, the seven-day continuance Hauschild sought (for the purposes of allowing inspection of juvenile court records pertaining to T.S. or Sherry) was the initial continuance sought at the jurisdictional hearing.
Moreover, even if Welfare and Institutions Code section 682 imposed the time limitation Hauschild erroneously thought it did, he still could have requested a continuance to a jurisdictional hearing date beyond the statutorily prescribed period, which would be deemed a waiver of speedy trial rights. (See, e.g., People v. Griffin (1971) 15 Cal.App.3d 442,447, 450 [93 Cal.Rptr. 319] [continuances totaling six months properly granted on the basis of defense counsel's representation that "further investigation is required"]; see also 5 Witkin Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Trial, §§ 319-321.)
Given the paramount responsibility of a judicial officer to assure the provision of a fair trial, we will not assume Judge LaCasse would have denied appellant an adequate continuance or other appropriate relief if the request was based on an adequate showing that Hauschild's excessive *Page 1244 
caseload and the limited resources of the public defender's office made it impossible for him to effectively represent appellant.
 III.
Even if a request for an adequate continuance was denied, or would not solve the funding problem that apparently prevented Hauschild from competently defending appellant, Hauschild had other means by which to protect appellant's right to effective representation. A court, before trial, may address a defendant's claim that he or she is receiving ineffective assistance of counsel and a motion allowing counsel to withdraw from the case and substitute other counsel. (People v.Stankewitz (1990) 51 Cal.3d 72, 87-88 [270 Cal.Rptr. 817, 793 P.2d 23] ["the Sixth Amendment right to effective representation virtually compels a hearing and an order granting a motion for substitution of counsel when `there is a sufficient showing that the defendant's right to the assistance of counsel would be substantially impaired if [the defendant's] request was denied'"]; see also State v. Peart (La. 1993)621 So.2d 780, 787.) The question is whether Hauschild's failure to take that course, or perhaps more saliently that of his supervisor, fell below an objective standard of reasonableness under prevailing professional norms relating to the responsibilities of public defenders and other publicly funded lawyers representing indigent accused persons.
The conduct required of attorneys in this state is determined not just by the Rules of Professional Conduct, the State Bar Act (Bus. Prof. Code, § 6000 et seq.) and judicial opinions, but also by consideration of "[e]thics opinions and rules and standards promulgated by other jurisdictions and bar associations." (Rules Prof. Conduct, rule 1-100(A).)[7] The American Bar Association (ABA) has devoted much attention to the obligations of a public defender in the predicament in which Hauschild found himself.[8] On May 13, 2006, the ABA issued its formal opinion No. 06-441, entitled "Ethical *Page 1245 
Obligations of Lawyers Who Represent Indigent Criminal Defendants When Excessive Caseloads Interfere with Competent and Diligent Representation" (ABA Com. on Ethics, formal opn. No. 06-441 (2006) p. 1 (ABA Opinion)). (8) Noting that, as under the California Rules of Professional Conduct (see rule 1-100(B)(1)(d)), a public defender's office "is considered to be the equivalent of a law firm" and "responsibility for handling [a] case[] . . . falls upon [the] office as [a] whole . . .," the opinion makes clear that the ethical obligations of public defenders and other publically funded attorneys who represent indigent persons charged with crimes are no different from those of privately retained defense counsel. (ABA Opinion, at p. 5, fn. 17.) Under the ABA Opinion, a deputy public defender whose excessive workload obstructs his or her ability to provide effective assistance to a particular client should, with supervisorial approval, attempt to reduce the caseload, as by transferring nonrepresentational responsibilities to others, refusing new cases, and/or transferring cases to another lawyer with a lesser caseload. If the deputy public defender is unable to obtain relief in that manner the ABA Opinion provides, he or she must "file a motion with the trial court requesting permission to withdraw from a sufficient number of cases to allow the provision of competent and diligent representation to the remaining clients." (Id. at p. 5.) In support of the motion, counsel "should provide the court with information necessary to justify the withdrawal, while being mindful of the obligations not to disclose confidential information or information as to strategy or other matters that may prejudice the client." (Id. at p. 6, fn. 23; see also Inre Order on Motions to Withdraw (Fla.Dist.Ct.App. 1992) 612 So.2d 597 (en banc) [public defender's office entitled to withdraw due to excessive caseload from representing defendants in 143 cases].) If the request to withdraw is denied by the trial court, the attorney should pursue appellate review. (See Iowa Supreme Court v. Hughes (Iowa 1996)557 N.W.2d 890, 894; see also Ligda v. Superior Court (1970)5 Cal.App.3d 811 [85 Cal.Rptr.744].) *Page 1246 
The conduct prescribed by the ABA Opinion, which is fully consistent with the California Rules of Professional Conduct, [9] may also be statutorily mandated.
Under the Penal Code, a public defender may not be assigned to represent an indigent defendant in a case in which he or she has a conflict of interest (Pen. Code, § 987.2, subds. (a)(3), (d), (e)), and a conflict of interest is inevitably created when a public defender is compelled by his or her excessive caseload to choose between the rights of the various indigent defendants he or she is representing. (In reOrder on Prosecution of Cr. App. (Fla. 1990) 561 So.2d 1130, 1135.) As we said in a different but related context in Ligda v. Superior Court,supra, 5 Cal.App.3d 811 at pages 827-828, "[w]hen a public defender reels under a staggering workload, he . . . should proceed to place the situation before the judge, who upon a satisfactory showing can relieve him, and order the employment of private counsel [citation] at public expense. Such relief, of necessity, involves the constitutional injunction to afford a speedy trial to a defendant. Boards of supervisors face the choice of either funding the costs of assignment of private counsel and often, increasing the costs of feeding, housing and controlling a prisoner during postponement of trials; or making provision of funds, facilities and personnel for a public defender's office adequate for the demands placed upon it." (See also Pen. Code, § 987.2, subd. (a) [reasonable compensation of assigned counsel to be paid out of county general fund].)[10]
Hauschild's declaration makes clear his awareness that his heavy caseload and the inadequate resources of the Mendocino County Public Defender's *Page 1247 
Office made it "impossible for me to thoroughly review and litigate [appellant's] case." Hauschild avers that he brought this problem to the attention of his supervisor, the Mendocino County Public Defender, but to no avail. Nor did the public defender himself independently seek the withdrawal of his office in appellant's case, as he might have done.[11]
(See Ligda v. Superior Court, supra, 5 Cal.App.3d 811.) In short, if the undisputed representations set forth in Hauschild's declaration under penalty of perjury are true, as for present purposes we must assume, Hauschild (and seemingly his supervisor) was not only aware the Mendocino County Public Defender's Office could not provide appellant effective representation, or should have been aware of this, but failed to take reasonable steps to avoid reasonably foreseeable prejudice to appellant's rights.
For the foregoing reasons, we conclude that the representation provided appellant by the Mendocino County Public Defender's Office was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Thus we turn to the second prong of the applicable test: whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," keeping in mind that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." (Strickland, supra, 466 U.S. at p. 694.)
 IV.
The frailty of the juvenile court's finding that Hauschild provided appellant effective assistance is reflected in the fact that the court felt it necessary to explain why appellant suffered no prejudice even if the assistance he received from Hauschild was ineffective. With respect to that issue the court placed special emphasis on the observations inLedesma, supra, 43 Cal.3d 171 about the "the danger of second-guessing in reviewing claims of ineffective assistance," namely the practical difficulty for judges in assessing the reasonableness of counsel's acts and omissions, and "the adverse consequences that *Page 1248 
systematic `second-guessing' might have on the quality of legal representation provided to criminal defendants and on the functioning of the criminal justice system itself." (Id. at p. 216.)
The juvenile court failed, however, to consider the Ledesma court's caveat "that deferential scrutiny of counsel's performance is limited in extent and indeed in certain cases may be altogether unjustified. `[D]eference is not abdication' [citation]; it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions. Otherwise, the constitutional right to the effective assistance of counsel would be reduced to form without substance." (Ledesma, supra, 43 Cal.3d at p. 217.) Despite the fact that, unlike the present case, the defense attorney inLedesma offered no explanation for why he acted or failed to act in the manner challenged, and the appellate record shed no light on the matter (id. at p. 218), the Ledesma court held that counsel provided ineffective assistance by failing to investigate the viability of a diminished capacity defense. The court rejected the Attorney General's argument that the failure to make this investigation was justified by the defendant's insistence on relying instead on an alibi defense. Even if the defendant had insisted on an alibi defense, the court explained, the Attorney General's contention would still lack merit, because "[c]ounsel's first duty is to investigate the facts of his client's case and to research the law applicable to those facts. `Generally, the Sixth Amendment and article I, section 15 require counsel's "diligence and active participation in the full and effective preparation of his client's case." [Citation.] Criminal defense attorneys have a "`duty to investigate carefully all defenses of fact and of law that may be available to the defendant. . . .'"` [Citation.] . . . That counsel . . . may be compelled to yield to his client's right to insist on the presentation of a defense of his own choosing [citation] does not excuse him from his duty to investigate and research other defenses so as to make an informed recommendation to his client [citation]." (Id. at p. 222.)
Ledesma, supra, 43 Cal.3d 171, does not support but undermines the ruling below. Unlike the defendant in Ledesma, appellant did nothing to discourage Hauschild from investigating the information Jason provided; indeed during the jurisdictional phase appellant was not even aware Jason provided or sought to provide Hauschild any information on his behalf. Moreover, unlike the defense attorney in Ledesma, Hauschild did not remain silent but acknowledged his failure to investigate and made clear it was not the result of any tactical calculation. That unusual admission and the reasons given by Hauschild for his deficient representation clearly warranted judicial attention.
The remaining reason Judge Wilson found appellant was not prejudiced by Hauschild's representation was that, while Judge LaCasse's jurisdictional *Page 1249 
determination was based on the credibility of the testimony of T.S., Judge Wilson felt that Sherry's testimony was also credible because Jason corroborated her statement that she phoned him and his wife before calling the police. Sherry's testimony was, however, relatively insignificant: The critical witness in this case was T.S., and Hauschild failed to subject her to any voir dire, made no inquiry into her ability to appreciate the difference between truth and falsity and to tell the truth; nor even asked her to promise to tell the truth, as may be required of a child her age. (Evid. Code, § 710.) Judge LaCasse made clear that, as he said at the hearing, "what it comes down to is whether the child is credible or not," and his finding that T.S. was credible does not appear to have rested at all on Sherry's credibility, which he had ample reason to question given the information provided in the sealed records he reviewed in camera. (See fn. 1, ante.) Moreover, had Hauschild subjected Sherry to cross-examination regarding her startling revelation that, over three generations, she was one of only two people in her extended family who had not been molested as a child — which opened the door to examination of the molestations and attempted molestations of T.S. and I.S., and the sexual acts of S.S. on another minor, as well as Sherry's own sexual acts with minors — her testimony would likely have been seen in a very different light.
Nor did Hauschild do anything to buttress appellant's testimony. The theory of Hauschild's defense was that appellant had no reason to molest T.S. and was not the sort of person likely to do so. As he emphasized in closing argument, at the time of the alleged molestation appellant was "turning his life around"; he had completed a drug treatment program, ended his past gang involvement, was regularly attending school, playing football, spending time with his 17-year-old girlfriend, and assisting Sherry with the raising of her children and the running of her household. Hauschild also emphasized appellant had never been charged with a sex offense of any sort. However, Hauschild failed to offer any testimonial or other evidence supporting this argument, such as Dr. Relouf's opinion that appellant "does not fit the typical personality or historical profile for juvenile sex offenders" and "lacked the psychological sophistication" necessary to maintain his innocence in the face of a polygraph test and then pass the test.
Acknowledging that the prosecution's case boiled down to the question "why would a ten-year-old child make this up?," Hauschild's only response was "well, its not the defense's burden to — to provide an answer to that question. And I don't think that anyone would have an answer to that question." But Jason had provided Hauschild several potential answers. First, Hauschild was given information suggesting T.S. may have obtained her knowledge of the sexual act she claimed appellant perpetrated not from his actions but from other sources. As Jason claimed (and Sherry corroborated), T.S. had previously been molested twice by adult members of her family and at least one of her siblings may have committed on another child *Page 1250 
the same type of molestation she claimed appellant committed on her. Jason also provided Hauschild information which, if verified, would cast doubt on T.S.'s credibility, including a specific example of her threatening to make a false accusation to get her way. (Evid. Code, § 780.) Jason further gave Hauschild reason to believe Sherry had threatened to send appellant back to juvenile hall, and that her anger at him may have stemmed from prior molestations and attempted molestations of T.S. and I.S. by her uncle and ex-husband. Despite Jason's report and provision of contact information for others who could provide similar evidence, all these possibilities were left wholly unexplored. This omission, of course, was exacerbated by Hauschild's failure to voir dire T.S. regarding her sexual experiences and the false accusation Jason said she threatened to make.
To prevail on his claim of ineffective assistant of counsel, appellant must show not just that Hauschild's deficiencies had some conceivable effect on the outcome of the proceeding, but that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Strickland, supra, 466 U.S. at pp. 693-694.) Specifically, "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." (Id. at p. 695.) "Finally, the burden of proof that the defendant must meet in order to establish his entitlement to relief on an ineffective-assistance claim is preponderance of the evidence." (Ledesma, supra, 43 Cal.3d at p. 218, citing In reImbler (1963) 60 Cal.2d 554, 560 [35 Cal.Rptr. 293, 387 P.2d 6].)
Mindful of the foregoing guidelines, we conclude that Hauschild's deficient performance prejudiced appellant within the meaning ofStrickland. First, the case must be considered a close one because there was no eyewitness or physical evidence and the matter turned almost entirely on credibility. Second, the evidence made available to Hauschild by Jason was germane to the central issue of the victim's credibility. Third, Hauschild failed to produce available evidence indicating that appellant does not fit the typical personality or historical profile for juvenile sex offenders and lacks the psychological sophistication necessary to steadfastly maintain his innocence over a long period of time and in the face of a polygraph test.
We conclude appellant has shown that, as a result of Hauschild's deficient performance, the jurisdictional proceedings conducted in the Mendocino County Superior Court were fundamentally unfair and unreliable (Strickland, supra, 466 U.S. at p. 684) and that there is "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." (Id. at p. 695.) *Page 1251 
 DISPOSITION
For the foregoing reasons, the judgment is reversed and the matter is remanded to the juvenile court with directions to conduct a new jurisdictional hearing.
Haerle, J., and Lambden, J., concurred.
[1] The sealed reports do not shed light on T.S.'s truthfulness, but they paint a picture of Sherry S. very different from that presented at the jurisdictional hearing as material to the present proceeding, the numerous reports show that complaints were frequently made to CPS that Sherry's children suffered general neglect and physical abuse, that the children were at risk for "sibling abuse," that her residence was a "drug house," and that Sherry "has a known history of selling drugs and sex to men" and was "known to have sex with under age boys." Some of the investigations of these reports proved "inconclusive," in others the complaints were unsubstantiated, but many, though it is hard to know exactly which ones, were "substantiated."
[2] Though motions for a new jurisdictional hearing are not specifically authorized by the Welfare and Institutions Code they have been deemed tantamount to motions under Welfare and Institutions Code sections 775 and 778 (relating to petitions to change, modify or set aside orders), and courts have in that way subjected them to the same rules as are applicable to motions for new trial in adult criminal cases. (In re Kenneth S. (2005) 133 Cal.App.4th 54, 62 [34 Cal.Rptr.3d 430]; In re Steven S. (1999) 76 Cal.App.4th 349,352-353 [90 Cal.Rptr.2d 290].) It is true that ineffective assistance of counsel is not among the nine grounds for ordering a new trial set forth in Penal Code section 1181, but our Supreme Court has made clear that "the statute should not be read to limit the constitutional duty of trial courts to ensure that defendants be accorded due process of law," and that in appropriate circumstances "the issue of counsel's effectiveness [may be presented] to the trial court as the basis of a motion for new trial." (People v. Fosselman (1983) 33 Cal.3d 572, 582 [189 Cal.Rptr. 855, 659 P.2d 1144].)
[3] As material, Evidence Code section 710 states that "Every witness before testifying shall take an oath or make an affirmation or declaration in the form provided by law, except that a child under the age of 10 . . . may be required only to promise to tell the truth."
[4] Hauschild states in his declaration that at the time he was representing appellant he was also representing defendants in two other sexual molestation cases, a minor charged in adult court with a serious felony, and he was then "solely responsible for all LPS Conservatorship cases within the Mendocino County Courts" and was engaged in a jury trial of such a case at the time of appellant's jurisdictional hearing.
[5] Appellant claims Hauschild never disclosed the foregoing information while he was representing him, and, if he had, appellant would have sought other counsel through the filing of a Marsden motion. (People v. Marsden (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].)
[6] People v. Cook, supra, 13 Cal.3d 663, disapproved on another ground in People v. Doolin (2009) 45 Cal.4th 390, 421, footnote 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].
[7] All further rule references are to the State Bar of California `Rules of Professional Conduct unless otherwise indicated.
[8] The ABA's interest in this issue is long standing. (ABA Standing Com. on Legal Aid Indigent Defendants, Gideon Undone: The Crisis inIndigent Defense Funding (Moran ed. 1983) [rep. of 1982 conference hearing]; ABA Standing Com. on Legal Aid Indigent Defendants, Lefstein, Criminal Defense Services for the Poor (ABA 1982).) In 2004, after extensive hearings on the issue, the ABA found that "[f]orty years after Gideon v. Wainwright, indigent defense in the United States remains in a state of crisis, resulting in a system that lacks fundamental fairness and places poor persons at constant risk of wrongful conviction" and that, as a result, "the integrity of the criminal justice system is eroded and the legitimacy of criminal convictions is called into question." (ABA Standing Com. on Legal Aid Indigent Defendants,Gideon's Broken Promise: America's Continuing Quest for Equal Justice
(Dec. 2004) p. 38, boldface omitted.) The ABA emphasized that "[f]unding for indigent defense services is shamefully inadequate," so that "[l]awyers frequently are burdened by overwhelming caseloads and essentially coerced into furnishing representation in defense systems that fail to provide the bare necessities for an adequate defense . . .," specifically including investigative resources, "resulting in routine violations of the Sixth Amendment obligation to provide effective assistance of counsel." (Ibid., boldface omitted; accord, ABA Special Com. on Crim. Justice in a Free Society, Criminal Justice in Crisis
(1988).) This view, hardly confined to the ABA, is shared not just by the United States Department of Justice, which has long been concerned about the problem (see, e.g., Off. of Justice Programs, U.S. Dept. of Justice,Improving Criminal Justice Systems Through Expanded Strategies andInnovative Collaborations (2000) [report of 1999 Nat. Symposium on Indigent Defense]; Spangenberg Group, U.S. Dept. of Justice, Contractingfor Indigent Defense Services; A Special Report (2000); Spangenberg Group, U.S. Dept. of Justice, Keeping Defender Workloads Manageable
(2001)), but by virtually all of the many scholars who have looked into the matter. (See, e.g., Lefstein, In Search of Gideon's Promise: Lessonsfrom England and the Need for Federal Help (2004) 55 Hastings L.J. 835, 846-847, fns. 53, 54, and cited authorities.)
[9] The Rules of Professional Conduct provide that a member of the California Bar "shall not intentionally, recklessly, or repeatedly fail to perform legal services with competence," which includes the exercise of such "diligence" as is reasonably necessary for the performance of a particular legal service. (Rule 3-110(A)-(B).) Where the member knows or should know that continued representation will result in the incompetent provision of legal services in a case before a tribunal, he or she shall, with the permission of the tribunal, seek to withdraw from such representation, after giving due notice to the client and allowing time for employment of other counsel. (Rule 3-700(A)(2), (B)(2).)
[10] We did not in Ligda v. Superior Court, supra, 5 Cal.App.3d 811, discuss the nature of the showing that must be made in support of such a motion to withdraw, nor need we do so here. Suffice it for us simply to note that whether a public defender's workload is so excessive as to warrant his or her removal and the substitution of other counsel requires evaluation not just of the size of the workload but the complexity of the cases that comprise it, available support services, and the attorney's nonrepresentational duties, if any. Furthermore, whether the workload of counsel is sufficiently excessive as to warrant substitution of counsel must be decided on the basis of objective criteria, such as national maximum public defender workload standards (see, e.g., Nat. Legal Aid 
Defender Assoc. Standards for the Defense (1973) std. 13.12, Workload of Public Defenders, p. 276 [report of 1973 Nat. Advisory Com. on Crim. Justice Standards Goals]) or standards that have been promulgated by many states. (See, Spangenberg Group, U.S. Dept. of Justice, KeepingDefender Workloads Manageable, supra, at pp. 11-12, table 2.)
[11] With respect to the responsibilities of a supervising public defender, the ABA Opinion states as follows: "In dealing with workload issues, supervisors frequently must balance competing demands for scarce resources. As Comment [2] to Rules 5.2 [of the Model Rules of Professional Conduct as amended by the ABA House of Delegates through August 2003] observes, if the question whether a lawyer's workload is too great is `reasonably arguable,' the supervisor of the lawyer has the authority to decide the question. In the final analysis, however, eachclient is entitled to competent and diligent representation. If asupervisor knows that a subordinate's workload renders the lawyer unableto provide competent and diligent representation and the supervisor failsto take reasonable remedial action, under Rule 5.1(c), the supervisorhimself is responsible for the subordinate's violation of the Rules ofProfessional Conduct." (ABA Opinion, supra, at p. 8, fn. omitted, italics added, citing, inter alia, Attorney Griev. Comm. v. Ficker (Ct.App. 1998)349 Md. 13 [706 A.2d 1045, 1052].) *Page 1252