Filed 5/13/13  P. v. DeCosta CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D059636 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB702860) |
| CHRISTOPHER DEAN DaCOSTA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Donna G. Garza and J. David Mazurek, Judges.  Affirmed as modified.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

Christopher Dean DaCosta (Defendant) appeals a judgment following his jury convictions of first degree murder (Pen. Code, § 187, subd. (a))[1] and kidnapping (§ 207, subd. (a)). On appeal, he contends: (1) he was denied his constitutional right to effective assistance of counsel because his defense counsel did not competently investigate his defenses; (2) the trial court erred by denying his motion for new trial based on ineffective assistance of counsel; (3) he was denied his constitutional right to effective assistance of counsel when, in moving for a new trial, his new appointed counsel did not correct misstatements of law; (4) he was denied his constitutional right to effective assistance of counsel when his defense counsel did not request a pinpoint instruction on the felony murder doctrine; (5) the trial court erred by imposing consecutive sentences for his two offenses in violation of section 654; and (6) the abstract of judgment should be corrected to reflect the number of presentence custody credits to which he is entitled.

FACTUAL AND PROCEDURAL BACKGROUND[2]

On the afternoon of July 22, 2007, a group of friends were having a party at the apartment of Andrew Baker (Andrew) in Yucaipa. The group included Defendant, Kelly McLeod (Kelly), Kelsey Angell (Kelsey), Courtney Otis (Courtney), Lauren Parsons

---

[1]     All statutory references are to the Penal Code.

[2]     Defendant and his codefendant, Kelly McLeod, were jointly tried before the same jury. The factual and procedural background in this opinion is substantially similar to the factual and procedural background in our previous opinion in *People v. McLeod* (Aug. 13, 2012, D058174) [nonpub. opn.] (*McLeod*). On June 16, 2011, on our own motion, we took judicial notice of the record in *McLeod*.

2

(Lauren), Jade, Holly, Elysse, Luke McLeod (Luke), Richard Hamilton (Richard), Aaron Dixon (Aaron), Mary Jo Dixon (Mary Jo), and Mark Smith (Mark).[3]

Mark became intoxicated quickly and began inappropriately grabbing the young women at the party. When Mark grabbed Lauren inappropriately, they fell to the ground. Kelsey went outside and informed Aaron of Mark's actions. When Aaron went inside the apartment, he saw Mark lying on top of Lauren, who appeared upset. Lauren got up and ran to the bathroom. Aaron told Mark to leave the party, but he refused. Mark and Aaron fought. After Aaron hit him at least two or three times, Mark fell to the floor. Aaron then left to check on Lauren.

Aaron told Kelly something to the effect: "Get [Mark] out of here, I don't want to see him again." Kelly dragged Mark out of the apartment and placed him supine on the driveway; Mark was alive and breathing at the time. Aaron kicked Mark in the head a couple of times. Kelly and Defendant then loaded Mark onto the bed of Courtney's truck[4] and drove off. Kelly drove and Defendant sat in the passenger's seat.

Meanwhile, Luke drove the young women (Kelsey, Courtney, Lauren, Jade, Holly, and Elysse) to Joe's house. They arrived at about 6:00 or 7:00 p.m.

Kelly arrived at Joe's house about one hour later. When asked what happened to Mark, Kelly replied he "took care of" Mark without providing any details. When

---

[3]    Andrew left his apartment before noon, returned for a short time at about 5:30 or 6:00 p.m., and later returned at about 7:30 p.m.

[4]    Kelly had the keys to Courtney's truck because Courtney believed she was too drunk to drive.

Courtney asked Kelly why he did not take Mark to a hospital, he replied that they would all get in trouble if he did. He said he had hidden Mark, but did not say where. Kelly said he had "wiped down" the truck.

At about 9:00 or 10:00 p.m., Courtney dropped Kelly off at his house. He told her he needed to go "check on" Mark. Courtney then returned to Joe's house.

Kelly returned to Joe's house at about midnight. He had Mark's wallet and stated he had it to prevent police from identifying Mark. When Courtney asked Kelly what happened, he replied that she did not need to worry about it and that he "took care of it." She asked him what that meant and he stated, "I killed him." Kelly described using a lead pipe to kill Mark.

One day later, Kelly and Defendant told some people at Andrew's house that they took Mark to the woods, stripped him of his clothes, and took care of it. They stated that if everyone kept their mouths shut, no one would discover that Mark was missing.

At about 9:00 a.m. on July 23, a hiker found Mark's body lying in a culvert near a dirt private road. San Bernardino County Sheriff's Detective Samuel Fisk responded to the hiker's 911 call. Fisk saw Mark's body lying face down in the culvert, with a large amount of blood on the back of his head and shoulders. Mark was not wearing a shirt and his pants were pulled half-way down his buttocks. He had vomit on his nose, mouth, shoulders, and chest. Fisk found an area where he believed Mark was dropped and rolled down into the culvert. Fisk saw indications that someone other than Mark had also been in the culvert.

4

A crime scene specialist examined the scene and, based on blood spatter around Mark's head and shoulders, concluded he received multiple strikes to the head at that location. An autopsy by Dr. Steven Trenkle, a forensic pathologist, showed Mark had extensive abrasions on his face, knees, thighs, lower back, and buttocks. Trenkle believed Mark was alive when he sustained those abrasions. Mark also had four parallel, linear lacerations on the right side of his head. They had the appearance of multiple blows, consistent with being struck by a bat, pipe, or other small, cylindrical object. Mark had two superficial fractures of the skull underneath those lacerations. There was hemorrhaging in the area between his skull and dura (covering of brain), and significant blood inside the ventricles of his brain. Trenkle concluded the blows to Mark's head (i.e., blunt force trauma) that resulted in those injuries were the cause of Mark's death. Based on the large amount of blood in Mark's hair and on the ground near his body, Trenkle concluded Mark was alive when he sustained those blows to his head and for some time thereafter.

On July 31, Detectives Fisk and Bessinger interviewed Kelly, who waived his *Miranda*[5] rights and then described what happened on July 22. Kelly described how he broke up a fight between Aaron and Mark, placed Mark in Courtney's truck, drove him to the private road and threw him into the ditch, and then drove to Joe's house. He said he believed Mark was alive when he placed him in the truck because he heard Mark moan and make gurgling noises. Later, while at Joe's house, he cleaned Courtney's truck and

---

5    *Miranda v. Arizona* (1966) 384 U.S. 436.

then Courtney drove him to his house. At home, Kelly took a lead pipe from his father's garage and drove a car (that he shared with his brother) back to the ditch where he left Mark. He stood at the top of the embankment and threw a rock at Mark. He then went down into the ditch and struck Mark's head three times with the pipe. He took Mark's wallet and cell phone. Kelly said he went back to the ditch "to make sure [Mark] was done." He said he did not take Mark to the hospital because he was scared and concerned Mark would go after him, believing he (Mark) had connections with white supremacists. Kelly later showed the detectives where he left the pipe, which was about five feet long and made of galvanized steel.

An information charged Defendant and Kelly with first degree murder and kidnapping. At trial, the prosecution presented evidence substantially as described above.

In his defense, Kelly testified that he tried to break up the fight between Aaron and Mark. Kelly testified Defendant helped him carry Mark out of the apartment by his arms and legs. They put Mark supine on the driveway. Aaron came over and stomped on Mark's head "quite a few times." Mark's head was "a mess" and covered in blood. He appeared unconscious. Kelly thought Aaron told him, "Get [Mark] out of here. I don't want to see him anymore." He testified he felt Aaron was going to get into trouble, and thought he had to move Mark. Kelly and Defendant drove Mark in the bed of Courtney's truck to the culvert. Kelly testified that he did not take Mark to a hospital because he did not know whether Mark was dead and was afraid he or Aaron would get into trouble. When he "flung" Mark into the culvert, Kelly thought he was dead. Although Kelly thought Mark was dead, he later returned with Defendant to the culvert because he was

6

paranoid that Mark might come after him, Aaron, or Defendant. Kelly brought along a metal pipe in the event Mark was not dead. After prodding Mark with the pipe, Kelly, suddenly angry about Mark grabbing Lauren and his (Kelly's) involvement in the situation, hit Mark in the head with the pipe a couple of times. He then handed the pipe to Defendant who hit Mark with the pipe two or three times. Kelly took Mark's wallet and later threw it into a dumpster behind a convenience store. Kelly returned to Joe's house after his second trip to the culvert. Kelly testified his actions that night were to protect Aaron and to keep him from getting in trouble.

In Defendant's defense, he presented the testimony of Luke, Kelly's brother, who stated he saw the fight between Aaron and Mark. Aaron kicked Mark in the face and side of the head at least 10 times. After Kelly and Defendant pulled Aaron off Mark, they carried Mark outside and laid him down on the driveway. While they were carrying Mark, Aaron continued to punch and kick him. After Kelly spoke with Defendant, they told everyone to go inside the apartment. When Luke went outside 15 minutes later, Kelly, Defendant, and Mark were no longer there. Luke then drove all the young women in his car to Joe's house. Kelly arrived alone at Joe's house about 15 minutes after Luke did. Luke initially testified he did not recall telling police during an interview that Kelly told him he (Kelly) and Aaron went back to where Mark was. On cross-examination, Luke testified that about one week after the incident Kelly told him he (Kelly) and Defendant took Mark to the culvert and later went back to check on him. On redirect examination, Luke, after refreshing his memory by reading a police report of his interview, admitted he told police that Kelly and Aaron arrived together at Joe's house in

7

Courtney's truck about 15 minutes after he (Luke) arrived. He told also police that about five minutes later Kelly and Aaron left in Otis's truck to take Aaron home. Kelly returned alone about five to 10 minutes later. Kelly stayed at Joe's house for the rest of the evening until he and Luke went home together. Luke apparently told police that several days later Kelly told him he (Kelly) and Aaron threw Mark's body into the ditch. On recross-examination, Luke stated it was his independent recollection that Kelly told him he (Kelly) and Defendant went to the ditch. Luke was never led to believe Aaron went with Kelly.

In rebuttal, the prosecution presented Fisk's testimony that during the first few hours of his interview, Kelly claimed he left Andrew's apartment when Mark and Aaron first began to fight. Fisk also testified that when he took Kelly back to the culvert, Kelly reenacted what he and Defendant did to Mark (i.e., throwing rocks at and then going down to Mark and striking him with the pipe). Kelly told Fisk he and Defendant threw rocks at Mark because they thought he was still alive. During a follow-up interview, Kelly told Fisk that after the fight, Aaron told Defendant and him to make Mark leave. He and Defendant then took Mark to the ditch and left him there.

The jury found Defendant guilty of first degree murder and kidnapping.[6] The trial court sentenced him to a determinate term of five years in prison for the kidnapping offense and a consecutive indeterminate term of 25 years to life for the first degree murder offense. Defendant timely filed a notice of appeal.

---

[6]    The jury also found Kelly guilty of first degree murder and kidnapping.

DISCUSSION

I

*Ineffective Assistance of Counsel Based on Inadequate Investigation*

Defendant contends he was denied effective assistance of counsel because his defense counsel did not competently investigate his defenses. He argues his defense counsel did not competently investigate the possibility of hiring a defense pathologist and the expected testimony of his only defense witness.

A

A criminal defendant is constitutionally entitled to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 684-685 (*Strickland*); *People v. Pope* (1979) 23 Cal.3d 412, 422, disapproved on another ground by *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.) To show denial of that right, a defendant must show: (1) his or her counsel's performance was below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance prejudiced the defendant. (*Strickland*, at pp. 687, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*); *Pope*, at p. 425.) To show prejudice, a defendant must show there is a reasonable probability that he or she would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, at pp. 693-694; *Ledesma*, at pp. 217-218.) "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the [trial counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." (*Strickland*, at p. 695.) "A reasonable probability is a probability sufficient to undermine

9

confidence in the outcome." (*People v. Williams* (1997) 16 Cal.4th 153, 215.) It is the defendant's burden on appeal to show that he or she was denied effective assistance of counsel and is entitled to relief. (*Ledesma*, at p. 218.) "[T]he burden of proof that the defendant must meet in order to establish his entitlement to relief on an ineffective assistance claim is preponderance of the evidence." (*Ibid*.)

"In evaluating a defendant's claim of deficient performance by counsel, there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' [citations], and we accord great deference to counsel's tactical decisions. [Citations.] . . . Accordingly, a reviewing court will reverse a conviction on the ground of inadequate counsel 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' " (*People v. Frye* (1998) 18 Cal.4th 894, 979-980.)

Under the right to effective assistance of counsel, "the defendant can reasonably expect that in the course of representation his counsel will undertake only those actions that a reasonably competent attorney would undertake. But he can also reasonably expect that before counsel undertakes to act at all he will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation. [Citations.] If counsel fails to make such a decision, his action--no matter how unobjectionable in the abstract--is professionally deficient." (*Ledesma*, *supra*, 43 Cal.3d at p. 215.) Criminal defense counsel has the duty to investigate carefully all defenses of fact and of law that may be available to the defendant. (*In re Williams* (1969) 1 Cal.3d 168, 175.) "The defendant can reasonably expect that before counsel undertakes to act, or not to act,

10

counsel will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation." (*In re Fields* (1990) 51 Cal.3d 1063, 1069.) "[T]o render reasonably competent assistance, an attorney bears certain basic responsibilities, including the investigation of available defenses . . . ." (*People v. Frierson* (1979) 25 Cal.3d 142, 160-161.)  "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (*Strickland*, *supra*, 466 U.S. at pp. 690-691.)  "[A] defense attorney who fails to investigate potentially exculpatory evidence, including evidence that might be used to impeach key prosecution witnesses, renders deficient representation.  [Citations.]  California case law makes clear that counsel has an obligation to investigate all possible defenses and should not select a defense strategy without first carrying out an adequate investigation." (*In re Edward S.* (2009) 173 Cal.App.4th 387, 407.)  Nevertheless, *Strickland* "made clear courts should not equate effective assistance with exhaustive investigation of potential mitigating evidence[.]" (*In re Andrews* (2002) 28 Cal.4th 1234, 1254.)  The United States Supreme Court "has recognized that valid strategic choices are possible even without extensive investigative efforts." (*Ibid*.)

We "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." (*Strickland*, *supra*, 466 U.S. at p. 690.)  Furthermore, we must consider the seriousness of the charges against the defendant in assessing counsel's performance.  (*In re Jones* (1996) 13 Cal.4th 552, 566.)

B

At trial, a forensic pathologist, Trenkle, testified for the prosecution. He performed an autopsy, which showed Mark had extensive abrasions on his face, knees, thighs, lower back, and buttocks. Trenkle believed Mark was alive when he sustained those abrasions, explaining a dead person's abrasions would appear more yellow-tan and lighter in color because his or her heart would have stopped beating and blood would no longer circulate throughout the body. In contrast, abrasions suffered by a live person would be more red, as blood would be circulating at the time of the abrasion. Mark also had four parallel, "vertically-oriented" linear lacerations on the right side of his head. They had the appearance of multiple blows, consistent with being struck by a bat, pipe, or other small, cylindrical object. Mark had two superficial fractures of the skull underneath those lacerations. There was some hemorrhaging in the area between his skull and dura (covering of brain), and significant blood inside the ventricles of his brain.

Trenkle also found gastric contents inside Mark's esophagus, the opening into his trachea, and lungs. Trenkle testified that although emesis (i.e., regurgitated food) commonly occurs in many deaths due to the loss of control of various sphincters, the amount of regurgitated food in Mark's airway exceeded that he would have expected as a part of the normal dying process. Based on the large amount of blood in Mark's hair, the blood inside his scalp, and the large pool of blood on the ground near his body, Trenkle concluded Mark was alive when he sustained the blows to his head and for some time thereafter. He further testified the injury to the back of Mark's head could, in and of

12

itself, be fatal. Trenkle concluded the blows to Mark's head (i.e., blunt force trauma) that resulted in the injuries to his head were the cause of his death.

In Defendant's defense, Luke testified, as described above, regarding the events of July 22, 2007. After Kelly and Defendant pulled Aaron off of Mark in the apartment and carried Mark outside, Aaron continued punching and kicking him. After they laid Mark on the driveway, Aaron still tried to punch and kick him. Although Aaron had stomped on Mark inside the apartment, he did not stomp on him while outside. Kelly and Defendant told everyone to go inside. When Luke went outside 15 minutes later, Kelly, Defendant, and Mark were gone. Luke took the young women to Joe's house and, 15 minutes after his arrival there, Kelly arrived alone at Joe's house.

On direct examination, Luke testified he did not tell, or recall telling, police during an interview that Kelly told him he (Kelly) and Aaron went back to where Mark was. Luke testified he did not recall telling police anything about what Kelly had done the night of the incident.

On cross-examination by the prosecutor, Luke testified he initially gave police a different story after discussing it in advance with Kelly. Luke told police Kelly and everyone else left the apartment as soon as Aaron and Mark began fighting. He gave police that version of events to protect everyone from getting into trouble. He denied telling police Mark was stomped on while lying on the driveway.

On cross-examination by Kelly's counsel, Luke testified Mark appeared unconscious after Aaron stomped on him inside the apartment. Luke testified Aaron was wearing bowling shoes. He saw blood on Mark's face and head, on Aaron's shoes, and on

13

the carpet. Outside, Luke did not see Mark's chest moving up or down and his eyes were half-closed. Luke testified that the day before his police interview Kelly told him he (Kelly) and Defendant took Mark to the culvert and later went back to check on him. He could not remember being asked by police whether he knew who went with Kelly to check on Mark in the culvert.

On redirect examination by Defendant's counsel, Luke testified he did not recall telling police it was Kelly and Aaron who went to the ditch. He explained that "[i]f I did say that, it must have been me not being in the right state of mind or saying the wrong thing." However, after refreshing his memory by reading a police report of his interview, Luke admitted he told police that Kelly and Aaron arrived together at Joe's house in Courtney's truck about 15 minutes after he (Luke) arrived. He told also police that about five minutes later Kelly and Aaron left in Otis's truck to take Aaron home. Kelly returned alone about five to 10 minutes later and stayed at Joe's house for the rest of the evening until he and Luke went home together. Luke apparently told police that several days later Kelly told him he (Kelly) and Aaron threw Mark's body into the ditch.

On recross-examination, Luke stated it was his independent recollection that Kelly told him he (Kelly) and Defendant went to the ditch. Luke was never led to believe Aaron went with Kelly.

On May 6, 2010, the date set for Defendant's sentencing hearing, his trial counsel, Byron Edwin Congdon, Jr., informed the trial court that Defendant wanted to file a motion for new trial based on ineffective assistance of counsel. Congdon requested that he be relieved as Defendant's counsel and new counsel be appointed for Defendant to

14

represent him on the issue of whether there were grounds for a motion for new trial. The court granted his request to be relieved. On May 20, the court appointed Stuart O'Melveny to represent Defendant on the issue of whether there were grounds for a motion for new trial.

On October 5, 2010, O'Melveny filed a motion for new trial on the grounds: (1) Congdon deprived Defendant of effective representation by failing to consult with and hire a defense pathologist; and (2) there was insufficient evidence to support his convictions. The prosecution opposed the motion.

*Hearing on motion for new trial.* On February 28, 2011, the trial court held a hearing on Defendant's motion for new trial. In support of his motion, Defendant presented the declaration of Dr. Harry J. Bonnell, a forensic pathologist, who testified in pertinent part:

> "7. Based on review of [the coroner's reports, the sheriff's investigative reports, photographs of the scene and autopsy, and Trenkle's trial testimony], as well as my education, training and experience, it is my opinion to a reasonable degree of medical certainty that:
>
> "[1.] As testified to by Dr. Trenkle, there were at least four impacts to [Mark's] head and death would have resulted in minutes[.]
>
> "[2.] The moans and gurgling noise emanating from [Mark] as he was loaded into the truck could occur simply from such manipulation and is not indicative of him being alive.
>
> "[3.] There was evidence at the house scene that trauma occurred there and [Kelly] stated that he dropped [Mark] causing him to hit his head.
>
> "[4.] [Aaron] also caused head trauma by kicking [Mark] in the head and stomping on the head.

15

"[5.]  The coroner records indicate a minimum amount of blood spatter at the recovery scene; this could occur from dumping the body at this location but is inconsistent with multiple fatal blows occurring at this scene since scalp wounds bleed briskly and there would be extensive castoff blood as well as spatter.

"[6.]  Any blows struck by [Defendant] at the scene where the body was recovered would be abuse of a corpse rather than an assault or homicide."[7]

O'Melveny argued Congdon provided Defendant with ineffective representation because had he retained a pathologist like Bonnell, he could have challenged the testimony of prosecution witnesses.  He argued Bonnell disagreed with Trenkle's opinion that the moans and gurgling noises made by Mark indicated he was alive when loaded onto the truck.  He also argued Bonnell disagreed with Trenkle's opinion there was a lot of blood splatter at the culvert, which would indicate Mark was alive when he was struck with the pipe there.  Based on the coroner's records showing there was a minimal amount of blood spatter at the culvert, Bonnell believed that minimal amount was inconsistent with the prosecution's theory that the fatal blows to Mark's head occurred at the culvert.

*Congdon's testimony*.  In opposition to the motion for new trial, the prosecution presented the testimony of Defendant's trial counsel.  Congdon testified that during his 23 years in the practice of law, he had handled over 75 murder cases.  He described how his approach to Defendant's defense evolved during the period from before the preliminary hearing through trial.  He initially focused on the defense that Mark was deceased before

---

7    Bonnell's declaration was admitted pursuant to counsel's stipulation that if he were called to testify, he would testify consistently with his declaration.

16

Defendant became involved in dumping Mark's body. Congdon spoke with Grover Porter, an experienced local defense attorney, regarding hiring a forensic pathologist who could determine the time and cause of Mark's death. Porter referred him to Dr. Paul Hermann, a forensic pathologist. Congdon spoke with Hermann regarding his availability and rates. Congdon discussed these defense issues with Mark McDonald, Kelly's counsel, and gave him Hermann's information. Shortly thereafter, McDonald retained Hermann and provided him with information regarding the case. Congdon thought about retaining a second pathologist, but decided to wait and find out Hermann's opinion before doing so. Congdon believed that if Mark died before being dumped at the ditch, that would help Kelly as much as it would help Defendant.

After McDonald received Hermann's opinion, he shared it with Congdon. McDonald told him that Hermann's opinion confirmed Trenkle's opinion regarding the time and cause of Mark's death and the timeline. Because Hermann's opinion was consistent with Trenkle's, it would not change anything to which Trenkle would be willing to testify. Because Hermann had been retained by McDonald, Congdon did not pursue any further discussions with Hermann. Congdon concluded there was no need for him to hire another pathologist. He instead changed his defense theory and focused on whether Defendant only helped load Mark's body onto the truck and a person other than Defendant went back to the ditch with Kelly. Congdon believed that theory was consistent with his reading of the facts and was the more viable defense. He explained that "there are some statements made by others that were interviewed having to do with putting a different person there with Kelly McLeod at the body dump, as well as going

17

back and clubbing [Mark]. It appeared that the more viable defense was somebody else did it. It was not [Defendant]." Congdon testified that he also investigated an alibi defense (i.e., Defendant was not there). However, after his investigator spoke with two potential alibi witnesses, Congdon determined he could not use them because of inconsistencies in their statements.

*McDonald's testimony*. The prosecution also presented the testimony of McDonald, Kelly's counsel. He was a deputy district attorney for eight years and then became a criminal defense attorney in 1996. He had handled 26 murder cases as a defense attorney and four as a prosecutor. In investigating a defense for Kelly, McDonald first consulted with Dave Posey, a pathologist he regularly used. After reviewing all the information McDonald gave him, Posey quickly determined his opinion would not differ from Trenkle's opinion. Posey's opinion heavily weighed on the vomitus, i.e., there was none in the apartment or truck, but it was around Mark's face and on the ground where he was discovered. Therefore, McDonald decided not to use Posey as an expert witness. McDonald also consulted with a neuropathologist, but insufficient slides were taken from Mark's body for him to make any determination. Therefore, McDonald decided not to use him as an expert witness.

About one year before trial, McDonald told Congdon that his pathologist and neuropathologist were not going to be of any value because they basically agreed with Trenkle. After Congdon told him about the availability of Hermann, McDonald retained Hermann before Congdon could. After reviewing the case information given him, Hermann told McDonald that Trenkle's opinion appeared to be correct. McDonald

18

conveyed Hermann's opinion to Congdon and decided not to use Hermann as an expert witness at trial. He believed it bordered on malpractice for the defense to call an expert witness who was going to agree with the prosecution's expert. McDonald decided it would be a better trial strategy to use cross-examination of Trenkle to allow the jury to consider other possibilities regarding the time and cause of Mark's death. McDonald testified that if he had found another pathologist who would have reached a different conclusion from Trenkle's, it would have benefited both Kelly and Defendant, explaining "[t]hey would have sank or swam together."

On cross-examination by O'Melveny, McDonald testified Hermann, unlike Trenkle, did not think the linear lacerations found on Mark could have been caused by the heel of a boot, but instead were caused by a pipe. In that respect, McDonald believed Trenkle's opinion actually benefited the defense. Hermann also concluded Mark's injuries had been inflicted before his death because he bled. He told McDonald that if he were called as a witness at trial, he could explain the lack of the expected amount of blood where Mark was found by noting blood could have been absorbed into the soil and Mark could have had a lower pulse and blood pressure after the initial beating, which resulted in less bleeding after he was struck with the pipe. Using that information, McDonald spoke before trial with Trenkle, who indicated those factors could possibly explain the less-than-expected amount of blood found at the scene. McDonald concluded Hermann's testimony would not be helpful to Kelly's defense and the only opinion that possibly could have been helpful was Hermann's indication that Mark could have died as a result of injuries inflicted by Aaron had Mark been left unattended. However,

McDonald concluded that testimony would not be helpful to the defense because it was a felony murder case. The prosecution could have argued that because Kelly kidnapped and took Mark to a place where he could not receive medical attention, Mark did not have a chance to survive the injuries inflicted by Aaron. McDonald believed that if Mark had died the minute he was put onto the truck based on injuries from Aaron's beating, the jury could have found both Kelly and Defendant guilty of felony murder. Accordingly, McDonald decided not to use Hermann as an expert witness at trial.

McDonald also testified that he had about seven cases in which Trenkle was the prosecution's pathologist. He believed Trenkle was a very honest person and a "consummate professional as far as a forensic pathologist for the prosecution." McDonald believed Trenkle's opinion was more equivocal in this case than in his prior cases and allowed for other possibilities regarding the cause of Mark's death.

*Trial court's ruling*. The trial court denied Defendant's motion for new trial. The court found Congdon did not commit any unprofessional errors in representing him. It found Defendant did not show Congdon's actions or inactions were not anything a reasonable attorney would have done in the same or similar circumstances of this case. The court noted Hermann's opinion basically substantiated the opinions of the other pathologists and was conveyed by McDonald to Congdon. Congdon then chose to pursue another defense theory, i.e., that Defendant was not present when Kelly went back to the ditch where he had left Mark. It found Bonnell's testimony would not have been dramatically different from Trenkle's testimony at trial.

20

## C

Based on our review of the record, we conclude Defendant has not carried his burden on appeal to show he was denied effective assistance of counsel. Under the *Strickland* two-part test, Defendant has not shown either that his trial counsel's performance was deficient under prevailing professional norms *or* that he was prejudiced by such purported deficient performance (i.e., it is reasonably probable he would have obtained a more favorable outcome had his counsel's performance not been deficient). (*Strickland*, *supra*, 466 U.S. at pp. 691-694.)

*Deficient performance*. Contrary to Defendant's assertion, we do not conclude Congdon's performance in representing Defendant was deficient in the circumstances of this case. Defendant primarily argues Congdon performed deficiently by failing to conduct an adequate investigation into the time and cause of Mark's death and to investigate the possibility of hiring a defense pathologist. However, as shown by the testimonies of Congdon and McDonald described above, Congdon investigated the possibility of hiring a defense pathologist. He spoke with Porter, an experienced criminal defense attorney, who referred him to Hermann, a forensic pathologist. However, before Congdon retained Hermann, McDonald retained him to obtain his opinion regarding the time and cause of Mark's death. Hermann substantially agreed with Trenkle regarding the time and cause of Mark's death. McDonald conveyed Hermann's opinion to Congdon. We cannot conclude, based on the circumstances in this case, that Congdon

21

acted unreasonably in relying on McDonald's statements regarding Hermann's opinion and not speaking directly with Hermann.[8]

Furthermore, we conclude Congdon did not act unreasonably by not pursuing another pathologist to review the information in this case and potentially reach an opinion different from that of Trenkle and Hermann. Before McDonald retained Hermann, he informed Congdon that a pathologist he had used before (i.e., Posey) had agreed with Trenkle. Therefore, Congdon had information that two potential defense pathologists had agreed with Trenkle's opinion before Congdon chose not to pursue another pathologist and instead change his defense theory to the "somebody else did it" theory. Although criminal defense counsel has the duty to investigate carefully all defenses of fact and of law that may be available to the defendant, he or she is not required to conduct an exhaustive investigation of potential mitigating evidence. (*In re Williams*, *supra*, 1 Cal.3d at p. 175; *In re Andrews*, *supra*, 28 Cal.4th at p. 1254.) In the circumstances of this case, we conclude Congdon performed a careful investigation into the time and cause of Mark's death and reasonably chose not to obtain the opinion of a defense pathologist other than Hermann. The reasonableness of Congdon's tactical decision is further supported by the fact that McDonald, Kelly's experienced defense counsel, also made a tactical decision not to present the testimony of Hermann or another pathologist.

---

[8]     To the extent McDonald's belief that Hermann's opinion would not be helpful was based on his (McDonald's) misunderstanding of the felony murder doctrine as discussed below, we conclude Congdon's reliance on McDonald's statements regarding Hermann's opinion was nevertheless reasonable.

Contrary to Defendant's apparent assertion, the fact that O'Melveny, in subsequently moving for a new trial, was able to obtain Bonnell's opinion, which differed from that of Trenkle's, does not, in itself, prove Congdon performed deficiently by not seeking the opinion of Bonnell or another pathologist after Hermann reached an opinion substantially the same as Trenkle's.

Furthermore, we conclude Congdon did not perform deficiently when, after learning of Hermann's opinion, he changed his defense theory to the "somebody else did it" theory. Congdon presumably had a police report showing Luke told police that Kelly told him he (Kelly) and *Aaron* (and not Defendant) went to the ditch where Mark was. That evidence would have supported an inference by the jury that Aaron, and not Defendant, was the person who accompanied Kelly back to the ditch and struck Mark two or three times with the pipe. Although Congdon also investigated possible alibi witnesses whose testimony was too inconsistent to use at trial, we cannot conclude Congdon acted unreasonably by relying on the expected testimony of Luke as proof at trial that it was Aaron (or someone else), and not Defendant, who accompanied Kelly back to the ditch and struck Mark in the head with the pipe. Defendant appears to argue Congdon performed deficiently by not interviewing Luke before trial to ascertain whether he would testify at trial consistently with his statements to police. Although in hindsight such an interview may have caused Congdon to refrain from presenting Luke's contrary trial testimony and/or what ultimately was an unsuccessful defense, we cannot conclude in the circumstances of this case that it was deficient performance for Congdon to rely on Luke's statements to police, as reflected in the police report, in deciding to present Luke's

23

testimony at trial in support of a "somebody else did it" defense theory.  Defendant has not presented any evidence or case law showing otherwise.  Accordingly, Defendant has not carried his burden on appeal to show, by a preponderance of the evidence, that Congdon's performance was deficient under prevailing professional norms.  (*Strickland*, *supra*, 466 U.S. at pp. 687, 690-694; *Ledesma*, *supra*, 43 Cal.3d at pp. 215-217; *In re Edward S.*, *supra*, 173 Cal.App.4th at p. 407; *In re Andrews*, *supra*, 28 Cal.4th at p. 1254.)

*Prejudice*.  Assuming arguendo Congdon's performance in representing Defendant was deficient, we nevertheless would conclude his deficient performance did not prejudice Defendant.  To show prejudice, Defendant must show there is a reasonable probability that he would have received a more favorable result had Congdon's performance not been deficient.  (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.)  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the [trial counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt."  (*Strickland*, at p. 695.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (*People v. Williams*, *supra*, 16 Cal.4th at p. 215.)

Defendant has not carried his burden on appeal to show he was prejudiced by Congdon's purported deficient performance.  As the People note, Trenkle acknowledged Mark's head injuries could have been caused by stomping and there was no way to determine the time of his death.  Yet the jury rejected the theory that Aaron, and not Kelly and Defendant, caused Mark's death.  McDonald, Kelly's counsel, argued in closing

24

that Mark may have died because of Aaron's stomping on his head. McDonald argued Trenkle's testimony was equivocal regarding the time and location of Mark's death or what mechanism (i.e., stomping versus striking with a pipe) caused the linear lacerations on Mark's head. Nevertheless, the jury rejected that theory when it found Kelly guilty on both counts. In also finding Defendant guilty on both counts, the jury presumably rejected the theory that Aaron caused Mark's death.

Furthermore, based on our review of the record, there is overwhelming evidence of Defendant's guilt on both counts. Kelly's trial testimony directly implicated Defendant in the actions leading to and causing Mark's death. Kelly testified he and Defendant carried Mark out of the apartment, loaded him onto the truck, and drove him to the ditch where he was dumped. Kelly also testified that both he and Defendant returned to the ditch to make sure Mark was dead. After Kelly hit Mark with a pipe a couple of times, Defendant hit him with the pipe two or three times. Other witnesses corroborated much of Kelly's testimony. Richard and Luke testified they saw Kelly and Defendant carry Mark out of the apartment. Richard testified he saw them lift Mark onto the bed of the truck. Luke testified Kelly later told him he (Kelly) and Defendant returned to the ditch to check on Mark. Courtney testified Defendant later told her he would take the blame if police found out about Mark. Kelly and Defendant later told Aaron and Andrew what they did to Mark and that he had been alive when they took him out of the apartment. Aaron testified that when Mark was at the apartment, he was alive and did not have the head injuries later found on him at the ditch. A crime scene specialist testified the blood spatter on the soil around Mark in the ditch showed he received multiple strikes to the

25

head at that location. Likewise, Trenkle testified the color of abrasions on Mark's body showed he was alive when he sustained those abrasions. Based on the blood inside Mark's scalp and large pool of blood found around his body, Trenkle concluded Mark was alive when he sustained the blows to his head and for some time thereafter.

Based on the above evidence and our review of the entire record, we conclude it is not reasonably probable Defendant would have obtained a more favorable result had his counsel's performance not been deficient. Even had Congdon investigated and presented an opinion of a defense pathologist and not chosen the defense theory that "somebody else did it," it is highly likely Defendant would nevertheless have been convicted of both kidnapping and first degree murder. (*Strickland*, *supra*, 466 U.S. at pp. 693-695; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.) Alternatively stated, Congdon's purported deficient performance is insufficient to undermine our confidence in the outcome of Defendant's trial. (*People v. Williams*, *supra*, 16 Cal.4th at p. 215.) Therefore, because Defendant has not carried his burden on appeal to show either that Congdon's performance was deficient or that such purported deficient performance was prejudicial, we conclude Defendant was not denied his constitutional right to effective assistance of counsel. (*Strickland*, at pp. 691-694.)

II

*Denial of Motion for New Trial*

Defendant contends the trial court abused its discretion by denying his motion for new trial based on ineffective assistance of counsel.

26

A

At the hearing on Defendant's motion for new trial based on ineffective assistance of counsel, Defendant presented Bonnell's declaration, as quoted above. In opposition, the prosecution presented the testimonies of Congdon and McDonald, as described above. In denying Defendant's motion for new trial, the trial court found Congdon did not commit any unprofessional errors in representing Defendant. It found Defendant did not show Congdon's actions or inactions were not anything a reasonable attorney would have done in the same or similar circumstances of this case. The court noted Hermann's opinion basically substantiated the opinions of the other pathologists and was conveyed by McDonald to Congdon. Congdon then chose to pursue another defense theory, i.e., that Defendant was not present when Kelly went back to the ditch. The court found Bonnell's testimony would not have been dramatically different from Trenkle's testimony at trial.

B

We conclude the trial court did not abuse its discretion by denying Defendant's motion for new trial. On appeal, we review a trial court's ruling on a motion for new trial for abuse of discretion. (*People v. Callahan* (2004) 124 Cal.App.4th 198, 201; *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1160.) In reviewing a trial court's ruling on a motion for new trial based on ineffective assistance of counsel, one court has stated:

> "The trial judge is the one best situated to determine the competency
> of defendant's trial counsel. Where, as here, defendant is
> represented by different counsel at the motion for a new trial and the
> issue is called to the trial court's attention, the trial judge's decision is
> especially entitled to great weight and we defer to his fact finding

27

power. Absent a showing of clear and unmistakable abuse, we will not disturb his decision." (*People v. Wallin* (1981) 124 Cal.App.3d 479, 483.)

"Since it is the trial court's function in the first instance to assess witness credibility and resolve conflicts in the evidence, the appellate court should give great deference to the trial court's factual determinations [citation] when deciding whether there has been an abuse of discretion." (*People v. Hinks*, *supra*, 58 Cal.App.4th at p. 1160.) However, because ineffective assistance claims present mixed questions of law and fact, they are generally subject to independent review as predominantly questions of law. (*In re Resendiz* (2001) 25 Cal.4th 230, 248-249; *Ledesma*, *supra*, 43 Cal.3d at p. 219.) Accordingly, although we defer to a trial court's factual and credibility determinations, we independently determine whether, based on those determinations, a defendant's counsel has provided ineffective assistance.

In ruling on Defendant's motion for new trial, the trial court in this case considered the same evidence we have in determining whether he was denied effective assistance of counsel. In denying Defendant's motion, the court implicitly made factual and credibility determinations adverse to Defendant. Based on those determinations, we independently determine whether Defendant was denied effective assistance of counsel. Because we concluded in part I, above, that Defendant was not denied effective assistance of counsel, we likewise conclude the trial court did not abuse its discretion by also concluding he was not denied effective assistance of counsel and denying his motion for new trial.

Contrary to Defendant's assertion, the fact that the trial court may have misstated some of the evidence in ruling on his new trial motion does not show the court abused its

28

discretion in denying his motion. He argues the court erred in stating Luke testified he had told police that Kelly told him he (Kelly) and Aaron had gone back to the ditch. He correctly notes the record shows Luke testified his statement to police was that Kelly told him he (Kelly) and Aaron took Mark's body and dumped it in the ditch and not that they went back to the ditch together.[9] He also argues the court erred by finding Bonnell's opinion (set forth in his declaration in support of Defendant's new trial motion) would not have been "dramatically different than what was" presented at trial (i.e., Trenkle's testimony). Nevertheless, applying the proper standard of review, any such misstatement or misunderstanding of the evidence by the trial court does not affect our independent conclusion that Defendant was not denied effective assistance of counsel and therefore the trial court did not abuse its discretion by denying his motion for new trial. Furthermore, Defendant does not persuade us the trial court abused its discretion because it did not consider all the material facts or applicable legal principles. We conclude the trial court did not abuse its discretion by denying Defendant's motion for new trial. (*People v. Callahan*, *supra*, 124 Cal.App.4th at p. 201; *People v. Hinks*, *supra*, 58 Cal.App.4th at p. 1160; *People v. Wallin*, *supra*, 124 Cal.App.3d at p. 483.)

---

9     The record does *not* support Defendant's additional assertion that before trial Congdon *knew* Luke had lied to the police during this interview, i.e., that Kelly told him he (Kelly) and Aaron took Mark to the ditch.

*Ineffective Assistance of New Appointed Counsel*

Defendant contends he was denied his constitutional right to effective assistance of counsel when O'Melveny, his new appointed counsel who represented him in his motion to new trial, failed to correct counsel's misstatements regarding the felony murder doctrine.

A

After the jury found Defendant guilty of first degree murder and kidnapping, the trial court appointed O'Melveny to represent him regarding whether there were grounds to file a motion for new trial. O'Melveny filed a motion for new trial based, in part, on a claim that Defendant was denied effective assistance of counsel. In opposing Defendant's motion for new trial, the prosecution filed papers arguing:

> "The defense offers no expert who would be willing to testify to an opinion different from that of Dr. Trenkle's[.] In fact, due to the Felony Murder Rule and the instructions given to the jury, the only opinion that could realistically have any chance of altering the outcome would be an opinion that the victim died before he was even put into the truck. The problem with that opinion, assuming one could even find such an opinion, is that it would contradict all of the evidence put forth during the trial. The eyewitness evidence, the physical evidence and the conduct and statements of the defendants [were] all consistent with [Mark] being clubbed at the ditch and dying at the ditch."

At the hearing on Defendant's motion for new trial, McDonald, Kelly's counsel, testified that he believed Hermann's testimony would not be helpful to Kelly's defense and the only opinion that possibly could have been helpful was Hermann's indication that Mark could have died as a result of injuries inflicted by Aaron had Mark been left

unattended.  However, McDonald concluded that testimony would not be helpful to the defense because it was a felony murder case.  The prosecution could have argued that because Kelly kidnapped and took Mark to a place where he could not receive medical attention, Mark did not have a chance to survive the injuries inflicted by Aaron.  McDonald also stated his belief that if Mark had died the minute he was put onto the truck based on injuries from Aaron's beating, the jury could have found both Kelly and Defendant guilty of felony murder.  McDonald discussed this information with Congdon, Defendant's trial counsel.  The trial court denied Defendant's motion for new trial.

B

Defendant asserts he was denied effective assistance of counsel because O'Melveny did not correct misstatements of the felony murder doctrine made by the prosecutor and McDonald.  He argues they misstated the law when they argued, in effect, Defendant and Kelly could have been found guilty of first degree murder under the felony murder doctrine if Mark had died after they kidnapped him, even if Aaron had previously inflicted the mortal injury on Mark that resulted in his death.  To the extent they misstated the felony murder doctrine (which we discuss in part IV below), O'Melveny probably should have corrected those misstatements.  However, Defendant does not present any evidence or case law showing O'Melveny's failure to correct those misstatements constituted deficient performance under prevailing professional norms.

Nevertheless, assuming arguendo O'Melveny performed deficiently by not correcting the misstatements by the prosecutor and McDonald on the felony murder doctrine, we conclude Defendant was not prejudiced by that deficient performance.

31

Defendant argues, in effect, it is reasonably probable the trial court would have granted his motion for new trial had O'Melveny corrected those misstatements. He argues: "It is reasonably probable that had O'Melveny advised the court that both the prosecutor and McDonald had misstated the law on felony murder and that a pathologist did not have to find that [Mark] was dead before being put in the truck in order to preclude finding [Defendant] guilty on Count one under a felony murder theory, the court would not have found reasonable Congdon's determination that using a pathologist 'would not be beneficial' to his client's case and that he should 'pursue another path,' i.e., that [Defendant] 'was not the person there at the time.' " We are not persuaded by that argument. Furthermore, assuming the trial court would have found Congdon's performance deficient had it been advised of those misstatements on the felony murder doctrine, we nevertheless conclude there is nothing in the record to indicate it is reasonably probable the trial court would have also found that deficient performance was prejudicial (i.e., it was reasonably probable Defendant would have obtained a more favorable result had Congdon not performed deficiently). Accordingly, based on our review of the entire record, we conclude Defendant has not carried his burden on appeal to show he was denied effective assistance of counsel when O'Melveny, his new appointed counsel, in moving for a new trial did not correct misstatements of the felony murder doctrine. (*Strickland*, *supra*, 466 U.S. at pp. 691-694.)

32

IV

*Ineffective Assistance of Counsel for Failure to Request*
*Pinpoint Instruction on Felony Murder Doctrine*

Defendant contends he was denied effective assistance of counsel when Congdon failed to request a pinpoint instruction on the felony murder doctrine. He argues Congdon should have requested a pinpoint instruction that if Defendant did not form the intent to kidnap Mark until after he (Mark) had been mortally wounded by Aaron, then Defendant could not be guilty of felony murder.

A

"[T]he trial court normally must, even in the absence of a request, instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case." (*People v. Carter* (2003) 30 Cal.4th 1166, 1219.) In addition, "a defendant has a right to an instruction that pinpoints the theory of the defense [citations]; however, a trial judge must only give those instructions which are supported by substantial evidence." (*People v. Ponce* (1996) 44 Cal.App.4th 1380, 1386.) Furthermore, "a trial court need not give a pinpoint instruction if it is argumentative [citation] [or] merely duplicates other instructions [citation] . . . ." (*People v. Bolden* (2002) 29 Cal.4th 515, 558.) "A pinpoint instruction 'relate[s] particular facts to a legal issue in the case or "pinpoint[s]" the crux of a defendant's case . . . .' " (*People v. Ward* (2005) 36 Cal.4th 186, 214.)

B

First degree murder includes murder that is willful, deliberate, and premeditated *or* that is committed in the perpetration or attempted perpetration of kidnapping (i.e., felony murder). (§ 189.) In this case, the trial court instructed the jury that Defendant could be found guilty of first degree murder under either of those two theories. The court instructed on the felony murder doctrine with CALCRIM Nos. 540A, 540B, and 549. The court instructed with CALCRIM No. 540A in pertinent part:

> "The defendant is charged in Count 1 with murder under a theory of felony murder. To prove that the defendant is guilty of first-degree murder under this theory, the People must prove that:
>
> "One, the defendant committed kidnapping;
>
> "Two, the defendant intended to kidnap and;
>
> "Three, while committing kidnapping, the defendant did an act that caused the death of another person.
>
> "A person may be guilty of felony murder even if the killing was unintentional, accidental or negligent. [¶] . . . [¶]
>
> "*The defendant must have intended to commit the felony of kidnapping before or at the time of the act causing death*. It is not required that a person die immediately as long as the act[s] causing the death in the felony are part of one continuous transaction. It is not required that the person killed be the victim of the felony." (Italics added.)

Regarding a killing and kidnapping for which the defendant is not the direct perpetrator, the court instructed with CALCRIM No. 540B in pertinent part:

> "The defendant is charged in Count 1 with murder under a theory of felony murder. The defendant may also be guilty of murder under a theory of felony murder even if another person did the act that resulted in the death. I will call the other person the perpetrator.

34

"To prove that the defendant is guilty of first-degree murder under this theory, the People must prove that:

"One, the defendant committed or aided and abetted kidnapping;

"Two, the defendant intended to commit or intended to aid and abet the perpetrator in committing kidnapping. If the defendant did not personally commit kidnapping, then a perpetrator who the defendant was aiding and [abetting] personally committed kidnapping; and

"Four, while committing kidnapping, the perpetrator did an act that caused the death of another person.

"Five, there was a logical connection between the act of death and the kidnapping. . . . [¶]

"A person may be guilty of felony murder, even if the killing was unintentional, accidental, or negligent. . . . [¶] . . . [¶]

"The defendant must have intended to commit or aid and abet kidnapping [before or at the time of the act causing the death.] It is not required that the person die immediately, as long as the act causing the death and felony are part of one continuous transaction. It is not required that the defendant be present when the act causing the death occurs."

## C

Defendant asserts he was denied effective assistance of counsel because Congdon did not request a pinpoint instruction stating that if Defendant did not form the intent to kidnap Mark until after he (Mark) had been mortally wounded by Aaron, then Defendant could not be guilty of felony murder. "Under the felony-murder rule, 'the evidence must establish that the defendant harbored the felonious intent either prior to or during the commission of the acts which resulted in the victim's death . . . .' " (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1016.) Alternatively stated, "the existence of [the required

35

felonious] intent is not measured at the time of the victim's death but at the time of the acts that caused the death." (*People v. Anderson* (2006) 141 Cal.App.4th 430, 446.) Accordingly, "when the killer forms the intent to commit an independent felony only after delivering the fatal blow to the victim, the felony-murder doctrine does not apply." (*People v. Lewis* (2001) 25 Cal.4th 610, 647; see also *People v. Green* (1980) 27 Cal.3d 1, 54, fn. 44 [no felony murder if intent to commit felony "arose after the infliction of the fatal wound"]; *People v. Anderson* (1968) 70 Cal.2d 15, 34 ["[T]he evidence must establish that the defendant harbored the felonious intent either prior to or during the commission of the acts which resulted in the victim's death; evidence which establishes that the defendant formed the intent only after engaging in the fatal acts cannot support a verdict of first degree murder based on section 189."].) In *People v. Gonzales* (1967) 66 Cal.2d 482, 486, the court held the jury was properly instructed that intent to rob formed after infliction of mortal wounds is insufficient to support a finding of first degree felony murder. Regarding aider and abettors, one court stated: "It would be an anomalous result to hold that an aider and abettor who is not himself the killer, and who does not himself have an intent to steal until after the victim has been mortally wounded, may be guilty of felony murder if the person he is aiding and abetting intended to commit robbery before killing the victim." (*People v. Esquivel* (1994) 28 Cal.App.4th 1386, 1396.)

Assuming arguendo Defendant waived his right to a pinpoint instruction on felony murder and his counsel performed deficiently by not requesting such a pinpoint instruction, we nevertheless conclude Defendant has not carried his burden to show he was denied effective assistance of counsel because he has not shown he was prejudiced

36

by that deficient performance. Defendant does not recite the specific language of the pinpoint instruction he believes his counsel should have requested. Based on his argument, we believe he argues his counsel should have requested a pinpoint instruction stating, in effect, that he could not be found guilty of felony murder if he did not form the intent to kidnap Mark until after he (Mark) had been mortally wounded by another person (e.g., Aaron). However, the trial court's instructions did, in fact, address such a scenario. As quoted above, the court instructed with CALCRIM No. 540A in pertinent part: "*The defendant must have intended to commit the felony of kidnapping before or at the time of the act causing death*." (Italics added.) The court gave a similar instruction for a scenario involving aiding and abetting a kidnapping. Therefore, the jury *was* instructed on the required order between formation of the felonious intent and the act causing the victim's death. The jury was instructed that for the felony murder theory to apply Defendant had to form the felonious intent *before* or at the time of the act causing Mark's death.

Under the instructions given by the court, if the jury had found Aaron's stomping on Mark's head at the apartment was the "act causing [his] death," then it could *not* find Defendant guilty of felony murder *if* it found he (Defendant) did not form the intent to kidnap Mark until *after* Aaron committed the act that caused Mark's death. Accordingly, the pinpoint instruction suggested by Defendant would not have provided any significant assistance to the jury in determining his criminal liability for first degree murder under the felony murder theory. At most, the pinpoint instruction would have rephrased the instructions already given by the court and potentially could have led the jury to more

37

quickly understand the standard instructions given on felony murder. However, absent affirmative evidence showing otherwise, we cannot presume the jury misunderstood the instructions given by the court. Therefore, we cannot conclude it is reasonably probable the jury would have reached a different verdict had Congdon requested, and the court given, a pinpoint instruction that Defendant could not be found guilty of felony murder if he did not form the intent to kidnap Mark until after he (Mark) had been mortally wounded by another person (e.g., Aaron).

Furthermore, the jury necessarily rejected the theory that Aaron, and not Kelly and Defendant, caused Mark's death. McDonald, Kelly's counsel, argued in closing that Mark may have died because of Aaron's stomping on his head. McDonald argued Trenkle's testimony was equivocal regarding the time and location of Mark's death or what mechanism (i.e., stomping versus striking with a pipe) caused the linear lacerations on Mark's head. Nevertheless, the jury rejected that theory when it found Kelly guilty on both counts. In also finding Defendant guilty on both counts, the jury necessarily rejected the theory that Aaron caused Mark's death. Finally, without restating the evidence discussed above, we conclude the evidence of Defendant's guilt of first degree murder under either of the premeditated murder or felony murder theories was overwhelming. Accordingly, it is not reasonably probable Defendant would have obtained a more favorable outcome at trial had his counsel not performed deficiently by failing to request the pinpoint instruction on felony murder. (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.) Therefore, Defendant was

38

not denied his constitutional right to effective assistance of counsel.[10] (*Strickland*, at pp. 687, 691-692; *Ledesma*, at pp. 216-217.)

V

*Section 654*

Defendant contends the evidence is insufficient to support the trial court's determination that his first degree murder and kidnapping offenses were committed with separate intents and objectives, and therefore imposition of multiple punishments for those offenses violated section 654. He asserts his sole intent and objective in committing both offenses was to protect Aaron, Kelly, and himself from getting in trouble with law enforcement or Mark and therefore section 654 prohibits multiple punishment for his offenses. He argues that, pursuant to section 654, the trial court should have stayed the five-year term imposed for his kidnapping offense.

A

At sentencing, the trial court imposed a determinate term of five years in prison for Defendant's kidnapping offense and a consecutive indeterminate term of 25 years to life in prison for his first degree murder offense. The court stated Defendant's "[t]otal commitment to state prison is for the term of [five] years, determinate, and [an]

---

[10] To the extent Defendant alternatively argues he was denied effective assistance of counsel because Congdon failed to request a pinpoint instruction on the aiding and abetting theory of the felony murder doctrine, we note the trial court, in fact, instructed with CALCRIM No. 540B on that aiding and abetting theory. Therefore, Defendant cannot show, and has not shown, that any absence of a pinpoint instruction on aiding and abetting was prejudicial (i.e., it is reasonably probable he would have obtained a more favorable outcome had such a pinpoint instruction been given).

indeterminate term of 25 [years] to life, with credit for time served." The trial court did not make any express finding that the two offenses were committed with separate intents and objectives or that section 654 did not preclude multiple punishments. However, by imposing consecutive terms for the two offenses, the trial court implicitly found they were committed with separate intents and objectives and section 654 did not preclude punishment of Defendant for each offense.

B

Section 654, subdivision (a), prohibits multiple punishment for the same act, stating:

> "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the largest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

Section 654 prohibits only multiple punishment, not multiple convictions, for the same act. (*People v. Britt* (2004) 32 Cal.4th 944, 951.)

"The test for determining whether section 654 prohibits multiple punishment has long been established: 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' (*Neal v. State of California* [(1960) 55 Cal.2d 11, 19, disapproved on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 334].) A decade ago, we criticized this test but also reaffirmed it as the established law of this state. (*People v. Latimer* (1993) 5 Cal.4th

40

1203, 1209-1216 [23 Cal.Rptr.2d 144, 858 P.2d 611].) We noted, however, that cases have sometimes found separate objectives when the objectives were either (1) consecutive even if similar or (2) different even if simultaneous. In those cases, multiple punishment was permitted. [Citation.] . . . [¶] Section 654 turns on the *defendant's* objective in violating both provisions . . . ."[11] (*People v. Britt*, *supra*, 32 Cal.4th at pp. 951-952.)

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) "[T]he power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might*

---

11     We note that on June 21, 2012, the California Supreme Court issued its opinion in *People v. Correa*, *supra*, 54 Cal.4th 331, which involves section 654. Based on our review of *Correa*, we conclude its holding does not apply to the circumstances in this case. Accordingly, we do not discuss its circumstances or holding.

*have reached a contrary conclusion*." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

C

We conclude there is substantial evidence to support the trial court's implied finding that section 654 did not preclude multiple punishment for Defendant's kidnapping offense and first degree murder offense because they were committed with separate intents and objectives. Considering the evidence, and all reasonable inferences, favorably to the People, we conclude the trial court could have reasonably inferred Defendant had a separate intent and objective in committing each offense.

The evidence showed that after the fight between Aaron and Mark, Aaron requested that Kelly get Mark out of the apartment because he did not want to see Mark any more. Kelly complied with Aaron's request by dragging Mark outside, with Defendant's assistance, and leaving Mark supine on the driveway. After Aaron came outside and kicked Mark a few times in the head, Kelly and Defendant loaded Mark onto the back of a truck, drove to the private dirt road, and dumped Mark in the culvert, leaving him there. Kelly then went to Joe's house. After two to three hours, Kelly went home, found a metal pipe, and drove with Defendant back to the culvert. There, Kelly first threw a rock at Mark and then went down into the culvert and struck him a couple of times on the head with the pipe. Defendant then struck Mark two to three times on the head with the pipe. The expert testimony supported the conclusion that those final blows with the pipe caused Mark's death.

42

Based on the above evidence, it could be reasonably inferred that Defendant committed a kidnapping when he assisted Kelly in dragging Mark out of the apartment and placing him on the driveway (i.e., Defendant used force to take Mark outside without Mark's consent). The trial court could reasonably infer that Defendant, in committing that kidnapping, acted with the sole intent and objective of merely assisting Kelly in complying with Aaron's request that Kelly move Mark out of his sight and *not*, as Defendant argues, with an intent and objective of protecting Aaron, Kelly, or himself from getting into trouble with law enforcement or Mark.

Alternatively, there is substantial evidence to support a conclusion that Defendant committed a kidnapping when he sat in the passenger's seat of the truck while Kelly drove Mark to, and dumped him in, the culvert (i.e., that Defendant used force, or aided and abetted Kelly's use of force, to take Mark to the culvert without Mark's consent). The trial court could reasonably infer that Defendant, in committing that kidnapping, acted with the sole intent and objective of merely assisting Kelly in complying with Aaron's request that he move Mark out of his sight and *not*, as Defendant argues, with an intent and objective of protecting Aaron, Kelly, or himself from getting into trouble with law enforcement or Mark.

There also is substantial evidence to support a conclusion that Defendant did not commit first degree murder until he returned to the culvert a few hours later and struck Mark two or three times in the head with a metal pipe. At trial, Kelly testified that, after prodding Mark with the pipe during the return trip, he became suddenly angry about Mark grabbing Lauren and his (Kelly's) involvement in the situation and then hit Mark in

43

the head with the pipe a couple of times. Defendant then hit Mark in the head with the pipe two or three times. The trial court could reasonably infer that, in committing that murder, Defendant acted with the sole intent and objective of mortally harming Mark because he, like Kelly, was angry at Mark and *not*, as Defendant argues, with an intent and objective of protecting Aaron, Kelly, or himself from getting into trouble with law enforcement or Mark.[12]

Although, as Defendant argues, Kelly testified at trial that his actions that night were taken with the sole intent and objective of protecting Aaron, Defendant, or himself from getting in trouble with law enforcement or Mark, the trial court could have reasonably rejected that explanation as incredible, self-serving testimony. Likewise, the trial court need not accept the truth of Kelly's subsequent explanations (e.g., at Joe's house and to detectives) that his intent in "taking care of" Mark and/or in not taking him to the hospital was to protect everyone at the party from getting in trouble. Because a defendant's intent in committing an offense may not be obvious or expressly stated by a defendant at the time of the offense, triers of fact (e.g., a trial court) must often, as in this case, infer from the defendant's actions and the surrounding circumstances what the defendant's intent or objective was in committing an offense. In this case, the trial court

---

[12]    Alternatively, we also conclude that there is substantial evidence to have supported a reasonable inference by the trial court that Defendant acted with dual intents and objectives in committing the first degree murder (i.e., (1) out of anger toward Mark, and (2) to protect Aaron, Kelly, or himself from trouble with law enforcement or Mark). In the event the court made that inference, there still would not be a single intent and objective for Defendant's kidnapping and first degree murder offenses.

44

could have reasonably rejected Kelly's proffered explanation of his intent in committing his two offenses and, instead, reasonably inferred that he and Defendant each had separate intents and objectives in committing the kidnapping and first degree murder offenses. To the extent Defendant cites evidence and inferences therefrom favorable to his position, he either misconstrues and/or misapplies the substantial evidence standard of review we apply in reviewing the trial court's implied finding in this case. (*People v. Jones*, *supra*, 103 Cal.App.4th at p. 1143; *Bowers v. Bernards*, *supra*, 150 Cal.App.3d at pp. 873-874.) Because there is substantial evidence to support the trial court's implied finding that Defendant's kidnapping and first degree murder offenses were committed with separate intents and objectives within the meaning of section 654, we conclude the trial court did not err by imposing multiple punishments for those offenses.

## VI

### *Presentence Credits*

Defendant contends the abstract of judgment should be corrected to reflect the number of presentence custody credits to which he is entitled.

### A

On February 28, 2011, the trial court (San Bernardino County Superior Court Judge Donna G. Garza) sentenced Defendant to a determinate term of five years for kidnapping and an indeterminate term of 25 years to life for first degree murder. However, it did not at that time award Defendant any credits for presentence custody he served, but instead noted "[h]e is entitled to credits" and set that matter "for a credits memo about three weeks out, March 29th, at 8:30 in Department 25."

45

On or about March 14, two abstracts of judgment were filed reflecting Defendant's prison sentences for his first degree murder and kidnapping convictions. However, neither abstract of judgment reflected any award of presentence custody credits. On March 29, the trial court (San Bernardino County Superior Court Judge J. David Mazurek) stated it had received a credits memo from the Probation Department and awarded Defendant 1,322 days of presentence custody credits.

B

Defendant asserts he is entitled to an award of 1,293 days of presentence custody credits and the abstracts of judgment should be corrected to reflect those credits. The People agree that the abstracts of judgment should be corrected, but state the proper amount of credits for Defendant's presentence custody is 1,322 days. We agree with Defendant's calculation regarding the number of presentence custody credits to which he is entitled.

"As a general rule, a defendant is supposed to have the trial court correct a miscalculation of presentence custody credits. (Pen. Code, § 1237.1.) However, if--as here--there are other appellate issues to be decided, the appellate court may simply resolve the custody credits issue in the interests of economy." (*People v. Jones* (2000) 82 Cal.App.4th 485, 493.) Section 2900.5, subdivision (a), generally provides that all days of local custody served by a criminal defendant shall be credited on his or her term of imprisonment. Alternatively stated, a defendant shall be awarded credits for all days served in presentence custody. (§ 2900.5, subd. (a).) Section 2900.5, subdivision (d), provides: "It shall be the duty of the court imposing the sentence to determine the date or

46

dates of any admission to, and release from, custody prior to sentencing and the total number of days to be credited pursuant to this section. The total number of days to be credited shall be contained in the abstract of judgment provided for in Section 1213."

In this case, as Defendant notes, he was arrested and placed in custody on August 16, 2007, and was sentenced on February 28, 2011. There are 1,293 days from August 16, 2007, through February 28, 2011.[13] Accordingly, Defendant is entitled to 1,293 days of presentence custody credits pursuant to section 2900.5. The trial court erred by awarding Defendant 1,322 days of presentence custody credits.[14] We exercise our discretion to modify the judgment to award the correct number of section 2900.5 presentence custody credits (i.e., 1,293 days) to which Defendant is entitled. Furthermore, the abstracts of judgment shall be amended to reflect that award.[15]

---

[13] We adopt Defendant's calculation of the number of days from August 16, 2007, through February 28, 2011 (i.e., 138 days in 2007; 366 days in 2008; 365 days in 2009; 365 days in 2010; and 59 days in 2011).

[14] That error presumably was the result of the Probation Department's erroneous assumption that March 29, 2011 (and not February 28, 2011), was the date of Defendant's sentencing, resulting in its mistaken belief that he was entitled to an additional 29 days of presentence custody credits, for a total of 1,322 days (i.e., 1,293 days plus 29 days). The record shows Defendant was sentenced on February 28, 2011, and not March 29, 2011. The trial court's award of presentence custody credits on March 29, 2011, did not change the date of his sentencing. The record shows that at the February 28, 2011, sentencing hearing Defendant was remanded to the custody of the Sheriff to be delivered to the California Department of Corrections and Rehabilitation.

[15] Defendant also contends the cumulative effect of the trial errors asserted above was prejudicial and denied him his constitutional right to a fair trial. Based on our discussion of each of those assertions above, we conclude there was no cumulative prejudice that deprived Defendant of his right to a fair trial.

DISPOSITION

The judgment is modified to reflect that Defendant is awarded 1,293 days of section 2900.5 presentence custody credits. In all other respects, the judgment is affirmed. The clerk of the trial court is directed to (1) issue amended abstracts of judgments reflecting the modified judgment and the award of 1,293 days of section 2900.5 presentence custody credits, and (2) deliver copies of such amended abstracts of judgment to the Department of Corrections and Rehabilitation.

McDONALD, J.

WE CONCUR:

BENKE, Acting P. J.

AARON, J.